IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

ALFRED ZAKLIT, *et al.,*          )
                                  )
    Plaintiffs,              )
                                  )
        v.                   )     1:14cv314 (JCC/JFA)
                                  )
GLOBAL LINGUIST SOLUTIONS,        )
LLC, *et al.,*                    )
                                  )
    Defendants.              )

**M E M O R A N D U M   O P I N I O N**

This matter is before the Court on Defendant Global
Linguist Solutions LLC's ("GLS" or "Defendant") Motion to
Dismiss the Amended Complaint, [Dkt. 79], and Motion to Strike
Plaintiffs' Jury Demand, [Dkt. 91].  For the reasons set forth
below, the Court will grant in part and deny in part GLS's
Motion to Dismiss and deny the Motion to Strike.

**I. Background[1]**

**A. Factual Background**

GLS is a Delaware corporation with its headquarters
and principal place of business in Herndon, Virginia.  (*See* Am.
Compl. [Dkt. 77] ¶ 6.)  GLS provides translation and

---

[1]  In considering a motion to dismiss for failure to state a claim, as is the
case here, "a court accepts all well-pled facts as true and construes these
facts in the light most favorable to the plaintiff[.]"  *Nemet Chevrolet, Ltd.
v. Consumeraffairs.com, Inc.,* 591 F.3d 250, 255 (4th Cir. 2009) (citations
omitted).  Accordingly, the following facts, taken from Plaintiffs' Amended
Complaint, are accepted as true for purposes of this motion.  *See Erickson v.
Pardus,* 551 U.S. 89, 94 (2007).

interpretation services to the United States Army.  (*Id.* ¶¶ 11-12.)  Plaintiffs are linguists who either currently work or have worked for GLS in Kuwait.  (*Id.* ¶¶ 2-4, 11-12.)

During 2012, Plaintiffs worked as translators in Kuwait for a company called Engility, who had subcontracted with GLS to provide linguist services to the U.S. Army under the Translation and Interpretation Management Services Contract ("TIMS contract").  According to Plaintiffs, their contracts with Engility provided for "base salaries; ten-percent hardship pay; per diem for meals; 30-days of vacation; and, 'completion payments' bonuses."  (Am. Compl. ¶ 14.)[2]

Upon their arrival in Kuwait under the TIMS contract, Plaintiffs allege that "GLS took their passports" to obtain work visas from its Kuwaiti sponsor, Al Shora International General Trading & Contracting ("Al Shora").  (Am. Compl. ¶ 16.)  Kuwaiti

---

[2]  Although Plaintiffs claim they worked for GLS and signed "employment contracts through GLS" before they arrived in Kuwait in 2012, (Am. Comp. ¶¶ 13-15), GLS has submitted a copy of the Engility contract which plainly provides otherwise.  (*See* Def.'s Mot. for Judicial Notice [Dkt. 90] Ex. 1.)  While a district court typically cannot consider matters outside the pleadings on a motion to dismiss, the Court may consider the Engility contract because it is referenced and quoted in the Amended Complaint.  *See Gasner v. Cnty. of Dinwiddie*, 162 F.R.D. 280, 282 (E.D. Va. 1995) ("[W]hen a plaintiff fails to introduce a pertinent document as part of his complaint, the defendant may attach the document to a motion to dismiss the complaint and the Court may consider the same without converting the motion to one for summary judgment.  This ruling encompasses not only documents quoted, relied upon, or incorporated by reference in the complaint, but also official public records pertinent to the plaintiffs' claims.").  Moreover, in light of Plaintiffs' prior declarations regarding the Engility contract, the Court will grant GLS's Motion for Judicial Notice.  *See O'Neal v. Donahoe*, 802 F. Supp. 2d 709, 715 n.7 (E.D. Va. 2011) ("It is well established that a court may take judicial notice, pursuant to Rule 201 of the Federal Rules of Evidence, of public court records and parties' admissions." (citation omitted)).

law allegedly requires that all foreign workers be placed on the rolls of a local sponsor. (*Id.* at ¶ 17.) The sponsor applies for working visas on behalf of the employees and manages aspects of their payroll. (*Id.*) A foreign employer is required to retain a local sponsor. (*Id.*)

Plaintiffs were deployed to several camps during their first few months of employment, eventually ending up at "Camp Arifjan." (Am. Compl. ¶ 18.) Plaintiffs allege they remained "virtual prisoners of GLS" at Camp Arifjan. (*Id.*) According to Plaintiffs, GLS "prohibited [them] from working or leaving the Camps for medical appointments, personal time or even emergency matters. They were told by GLS that they would be arrested, imprisoned and/or deported by the Kuwaiti government if they left the base." (*Id.* at ¶ 19.) Plaintiffs further allege that "GLS relegated [them] and other Linguists [to] crammed and abominable substandard living conditions. Forty Linguists were assigned to live in one 3000-square-feet tent with limited air conditioning, running water and electricity." (*Id.* at ¶ 20.)

Sometime in late 2012 or early 2013, GLS was awarded a contract to provide linguistic services to the U.S. Army pursuant to the Defense Language Interpretation Translation Enterprise contract ("DLITE contract"). (Transfer Order [Dkt. 40] at 30.) In conjunction, GLS allegedly re-bid its Kuwaiti sponsorship contract. "GLS severed its ties with . . . Al

Shora, in favor of a new Kuwaiti company, KRH." (Am. Compl. ¶ 28(a).) This apparently led to a dispute between Al Shora and GLS. Plaintiffs claim that, "GLS was unable to obtain Al Shora's agreement to continue sponsoring Plaintiffs for GLS or to transfer their sponsorship to another Kuwaiti entity." (*Id.* at ¶ 28(d).)

In January 2013, GLS presented Plaintiffs with new employment contracts to provide linguistic services under the DLITE contract. (*See* Am. Compl. ¶ 22.) According to Plaintiffs, "GLS forced Plaintiffs to sign new form employment contracts directly with GLS under [the] horrid" living conditions mentioned above. (*Id.*) Plaintiffs claim that these new agreements removed many benefits from their prior contracts with Engility, "including the ten-percent hardship pay; per diem for meals; and, 'completion payments' bonuses." (*Id.* at ¶ 23.) Plaintiffs allege that "GLS expressly told [them] to sign the form without reading anything" and that "GLS never suggested to them that they should discuss the terms with a lawyer." (*Id.* at ¶¶ 24-25.) According to Plaintiffs, "they had no choice but to sign the form because GLS threatened to kick them off the base[.]" (*Id.* at ¶ 26.) Plaintiffs further allege that, at the time they entered into the new contracts, they were "under GLS's total control and domination because they held their passports." (*Id.* at ¶ 27.)

4

Pertinent here, Plaintiffs allege that when presented with the 2013 contracts they were never advised of the dispute between GLS and Al Shora regarding their sponsorship status. According to Plaintiffs, "[a]t the time GLS had Plaintiffs sign the 2013 [c]ontract, GLS's employment of Plaintiffs in Kuwait was unlawful since GLS was unable to obtain Al Shora's agreement to continue sponsoring Plaintiffs for GLS or to transfer their sponsorship to another Kuwaiti entity." (Am. Compl. ¶ 28(b).) Furthermore, according to Plaintiffs, "[t]he lack of Kuwaiti sponsorship was material and Plaintiffs would not have signed or entered into the 2013 Contract had they been aware that GLS did not have a sponsorship agreement with a Kuwaiti entity that would cover Plaintiffs' employment under the 2013 Contract." (*Id.* at ¶ 28(g).)

GLS's dispute with Al Shora apparently went unresolved, and in March 2013 "Al Shora turned over the names of GLS's employees (including Plaintiffs) to Kuwaiti immigration authorities, declared them absent from work, and in violation of their working visas. Consequently Plaintiffs' . . . work visas were cancelled, and they were placed on Kuwaiti's 'blacklist' for arrest and/or deportation." (Am. Compl. ¶ 28(k).) According to Plaintiffs, "GLS's actions and legal dispute with Al Shora made Plaintiffs and other Linguists fugitives in a foreign country." (*Id.* at ¶ 28(m).) Sometime thereafter, "GLS

conveniently demoted and/or terminated Plaintiffs." (*Id.* at ¶ 31.)

**B. 2013 Contract with GLS**

As noted above, prior to starting with GLS under the DLITE contract, Plaintiffs signed new employment agreements directly with GLS. These contracts are uniform and contain a "Governing Law" section that includes a Virginia choice-of-law provision and a Virginia forum-selection clause.[3] (*See* Phillips Decl. [Dkt. 91] Ex. 1.) The Governing Law section provides as follows:

> This Agreement shall be governed by and interpreted under the laws of the Commonwealth of Virginia of the United States of America. Any cause of action against the Employer must be brought in a federal court within the Commonwealth of Virginia unless the federal court does not have jurisdiction, in which case the cause of action must be filed in Commonwealth court in Virginia.

(*Id.* at 11.)

In addition to this section, the contracts also make clear that Plaintiffs are at-will employees. The contracts specifically state that GLS has the right "at its sole discretion" to terminate its employment relationship with Plaintiffs "without cause at any time" and that Plaintiffs likewise "may voluntarily terminate this Agreement at any time."

---

[3] The Court may consider Plaintiffs' 2013 employment contracts with GLS because the Amended Complaint incorporates them by reference. *See Philips v. Pitt Cnty. Mem.'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

(Phillips Decl. Ex. 1 at 8.)  The contracts state that GLS will "provide return transportation from the Employee's work location" to the United States "if this Agreement is terminated," (*id.* at 8), but cautioned that "[t]ravel could be significantly restricted, delayed or made more difficult by operational requirements of the military or by restrictions imposed by civil authorities[.]" (*Id.* at 4.)  The contracts also provide that "this assignment carries the risk of bodily harm/death," and "[l]iving conditions at the assignment location could be remote and uncomfortable." (*Id.*)

### C. Procedural History

Plaintiffs initially brought this action in California state court, alleging sixteen causes of action under California law against GLS, DynCorp International LLC, and AECOM Services (collectively "Defendants").  Defendants subsequently removed the case to the United States District Court for the Central District of California ("California court").  (Notice of Removal [Dkt. 1] at 1.)  The California Court then granted Defendants' motion to transfer the case to this Court on the basis of the Virginia forum-selection clause.  (Transfer Order at 45.)

Following transfer to this Court, Defendants moved to dismiss the complaint.  [Dkts. 51, 55, 57.]  In response, Plaintiffs voluntarily dismissed every defendant except GLS, [Dkt. 74], and filed an Amended Complaint.  In the Amended

7

Complaint now before the Court, Plaintiffs allege eleven causes of action: false imprisonment ("Count 1"); negligent hiring and retention ("Count 2"); intentional infliction of emotional distress ("Count 3"); negligent infliction of emotional distress ("Count 4"); fraud ("Count 5"); rescission ("Count 6"); promissory fraud ("Count 7"); negligent misrepresentation ("Count 8"); breach of contract ("Count 9"); breach of the implied covenant of good faith and fair dealing ("Count 10"); and breach of Kuwaiti labor law ("Count 11"). (*See* Am. Compl. ¶¶ 59-132.) With the exception of Count 11, Plaintiffs do not specify what body of law purportedly governs their claims.

GLS has moved to dismiss the Amended Complaint in its entirety and strike Plaintiffs' jury demand. Having been fully briefed, GLS's motions are now before the Court.[4]

## II. Standard of Review

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint[.]" *Republican Party of N.C. v. Martin,* 980 F.2d 943, 952 (4th Cir. 1992) (citation omitted). The Supreme Court has stated that in order "[t]o survive a

---

[4] Along with their opposition to GLS's Motion to Dismiss, Plaintiffs filed a motion asking the Court to take judicial notice of a brief submitted by GLS in a companion case based upon the same allegations at issue here. [Dkt. 87.] The Court will deny Plaintiffs' motion because this document is unnecessary for the Court to render its decision below. *See Loftus v. F.D.I.C.,* No. 2:13-CV-00379-PMD, 2013 WL 5797727, at *4 (D.S.C. Oct. 28, 2013) (denying motion for judicial notice where the defendant "failed to satisfy its burden of demonstrating that each exhibit [was] relevant to the instant [m]otion").

motion to dismiss, a [c]omplaint must contain sufficient factual
matter, accepted as true, to 'state a claim to relief that is
plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678
(2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570
(2007)). "A claim has facial plausibility when the pleaded
factual content allows the court to draw the reasonable
inference that the defendant is liable for the misconduct
alleged." *Id.* The issue in resolving such a motion is not
whether the non-movant will ultimately prevail, but whether the
non-movant is entitled to offer evidence to support his or her
claims.

"Determining whether a complaint states a plausible
claim for relief [is] . . . a context-specific task that
requires the reviewing court to draw on its judicial experience
and common sense." *Iqbal,* 556 U.S. at 679 (citations omitted).
While legal conclusions can provide the framework for a
complaint, all claims must be supported by factual allegations.
*Id.* Based upon these allegations, the court will determine
whether the plaintiff's pleadings plausibly give rise to an
entitlement to relief. *Id.* Legal conclusions couched as
factual allegations are not sufficient, *Twombly,* 550 U.S. at
555, nor are "unwarranted inferences, unreasonable conclusions,
or arguments," *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship,*
213 F.3d 175, 180 (4th Cir. 2000). Moreover, the plaintiff does

not have to show a likelihood of success; rather, the complaint must merely allege - directly or indirectly - each element of a "viable legal theory." *Twombly,* 550 U.S. at 562-63.

In addition, at the motion to dismiss stage, the court must construe the complaint in the light most favorable to the plaintiff, read the complaint as a whole, and take the facts asserted therein as true. *Iqbal,* 556 U.S. at 678.

### III. Analysis

#### A. Choice of Law

Before reaching the merits of Plaintiffs' claims, the Court must first address the important question of the applicable choice of law. *See, e.g., Pa. Emp., Benefit Trust Fund v. Zeneca, Inc.,* 710 F. Supp. 2d 458, 466 (D. Del. 2010) (noting that before addressing a motion to dismiss, "the Court must first resolve the choice of law question to determine the applicable law relevant to each [claim]"). It is undisputed that Plaintiffs' employment contracts contain a choice-of-law provision naming Virginia law as controlling. The parties, however, sharply contest the validity of this clause. Plaintiffs assert that this choice-of-law provision is unenforceable because their employment contracts were procured by "fraud and/or overreaching."[5] (Am. Compl. ¶ 96.) According

---

[5] Overreaching, as used by Plaintiffs here, is defined as the "act or an instance of taking unfair commercial advantage of another." Black's Law Dictionary (7th ed. 1999); *see also United Rentals, Inc. v. Pruett,* 296 F.

to Plaintiffs, GLS "forced them" to sign these contracts "after
their work visas and passports were revoked from them . . . and
[when they] faced the prospect of being thrown into Kuwaiti
jail." (*Id.* at ¶ 94.)  Plaintiffs further allege "that GLS
expressly told [them] to sign the form without reading anything"
and "they had no choice but to sign the form because GLS
threatened to kick them off the base, and subject them to
immediate arrest and detention by Kuwaiti official[s]." (*Id.* at
¶¶ 24-26.)  GLS, in opposition, argues that these claims of
fraud and overreaching are insufficient because Virginia law
requires that allegations of fraud and overreaching be directed
specifically at the inclusion of a dispute resolution provision,
which is not the case here.  (Def.'s Mot. to Dismiss Mem. [Dkt.
80] at 10-11.)  Defendant continues, "[a]bsent allegations of
fraud or misleading regarding the inclusion of the choice-of-law
provision '*in particular*,' Plaintiffs' attempt to invalidate the
provision fails." (*Id.*)  Accordingly, at issue is whether
general allegations of fraud and overreaching going to the
contact as a whole are sufficient to invalidate a choice-of-law
provision.

---

Supp. 2d 220, 227 (D. Conn. 2003)  ("While unequal bargaining power of the
parties cannot, in itself, support a finding of overreaching . . .
overreaching may be found if the disparity in bargaining power was used to
take unfair advantage of the employee.").

It is well settled that a federal district court sitting in diversity and resolving a transferred matter must apply the laws of the transferor state, including its choice-of-law rules. *See Van Dusen v. Barrack,* 376 U.S. 612, 639 (1964). Accordingly, in this case, California law would typically govern both the enforceability of the choice-of-law provision as well as its appropriate scope. Yet, here it is appropriate to depart from this principle given the equally settled principle that the law of the transferor state should not govern when the transfer is based on improper venue. *See Atl. Marine Constr. Co., Inc. v. U.S. Dist. Court for W. Dist. of Tex.*, __ U.S. __, 134 S. Ct. 568, 582 (2013) ("[When] a party bound by a forum-selection clause flouts its contractual obligation and files suit in a different forum, a § 1404(a) transfer of venue will not carry with it the original venue's choice-of-law rules."). When the basis for transfer is a forum-selection clause in the parties' contract, this exception to the *Van Dusen* rule applies because under those circumstances venue in the transferor state is, by the terms of the parties' agreement, improper. To hold otherwise would allow a plaintiff to file a claim in a court without proper venue to avoid the effect of a contractual forum-selection clause and the unfavorable choice-of-law that would otherwise have resulted. In such circumstances the transferee court "must follow the choice-of-law rules of the State in which

12

it sits." *Id.*   Because this case was transferred from California due to improper venue, the Court will apply Virginia law to determine the choice-of-law provision's validity and scope.   *See Pyott-Boone Elecs. Inc. v. IRR Trust for Donold L. Fetterolf Dated Dec. 9, 1997*, 918 F. Supp. 2d 532, 542-43 (W.D. Va. 2013).

Virginia has long recognized that parties to a contract may agree in advance which jurisdiction's law will apply to their transaction.   *See Union Cent. Life Ins. Co. v. Pollard,* 94 Va. 146 (1896).   In *Pollard,* the parties included language in their contract that it would be "held and construed to have been made in the city of Cincinnati, Ohio."   *Id.* at 146. The Virginia Supreme Court concluded that "[t]he contract of insurance having been made with reference to the laws of the state of Ohio, the plaintiff had the right to rely upon them in enforcing his contract so far as they related to its validity, nature, interpretation, and effect."   *Id.*   Subsequent cases have reinforced this right.   *See, e.g., Settlement Funding, LLC v. Von Neumann-Lillie,* 274 Va. 76, 80 (2007) ("If a contract specifies that the substantive law of another jurisdiction governs its interpretation or application, the parties' choice of substantive law should be applied." (citation omitted)).

Virginia law now looks favorably upon choice-of-law clauses in a contract, giving them full effect except in unusual

circumstances.  *See Colgan Air, Inc. v. Raytheon Aircraft Co.,*
507 F.3d 270, 275 (4th Cir. 2007).  "The only intimations that
Virginia might not enforce the parties' choice-of-law provision
in a contract concern situations in which there was no
reasonable basis for the parties' choice or where one of the
parties was misled into agreeing to the provision."  *Faltings v.*
*Int'l Bus. Machs. Corp.,* No. 87-1123, 1988 WL 83316, at *3 (4th
Cir. Aug. 4, 1988) (citations omitted).  More recently, this
Court noted "absent a showing that the provisions of the clause
are unfair or unreasonable, or are affected by fraud or unequal
bargaining power, or that the parties did not clearly intend for
the designated law to govern the terms of the contract,
[Virginia law] will give full force to choice-of-law
provision[s] in a contract."  *Senture, LLC v. Dietrich,* 575 F.
Supp. 2d 724, 727 (E.D. Va. 2008).

Yet, outside of the general language noted above, the
case law is sparse concerning what exactly must be shown to
upset a choice-of-law provision.  Neither party has cited any
precedent from the Virginia Supreme Court squarely addressing
the pertinent question here, *i.e.* whether general allegations of
fraud and overreaching going to the contract as a whole are
sufficient to invalidate a choice-of-law provision, and the
Court's research has found none.  When presented with a nebulous
question of state law, this Court "has a duty to apply the

operative state law as would the highest court of the state in which the suit was brought." *Liberty Mut. Ins. Co. v. Triangle Indus., Inc.,* 957 F.2d 1153, 1156 (4th Cir. 1992).  In the absence of controlling precedent from the Virginia Supreme Court, as is apparently the case here, this Court must use its own best judgment to predict how the state court would decide the relevant substantive issues.  "To forecast a decision of the state's highest court [this Court can] consider, *inter alia:* canons of construction, restatements of the law, treatises, recent pronouncements of general rules or policies by the state's highest court, well considered dicta, and the state's trial court decisions." *Wells v. Liddy,* 186 F.3d 505, 528 (4th Cir. 1999) (citation omitted).

      In recent years, the Virginia Supreme Court has indicated its willingness to apply a "more modern view" and "hospitable attitude" toward dispute resolution provisions such as choice-of-law and forum-selection clauses. *Paul Bus. Sys., Inc. v. Canon U.S.A., Inc.,* 240 Va. 337, 342 (1990) (citing *The Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 10 (1972)); *see also Haynsworth v. The Corp.,* 121 F.3d 956, 963 (5th Cir. 1997) (noting that there is little difference between arbitration, forum-selection, and choice-of-law clauses for enforceability purposes).  Although the *Paul* decision is devoid of any instruction as to what a trial court is to employ when

15

confronted with general allegations of fraud or overreaching, the modern view cited by *Paul* is that "any fraud sufficient to vitiate [a] forum selection provision must be directed specifically at the insertion of the forum selection clause in the contract and be proven by clear and convincing evidence." *Ash-Will Farms, L.L.C. v. Leachman Cattle Co.,* Nos. 02-195, 02-200, 2003 WL 22330103, at *3 (Va. Cir. Ct. Feb. 13, 2003); *see also Scherk v. Alberto-Culver Co.,* 417 U.S. 506, 519 n.14 (1974).

Federal courts applying the modern view cited in *Paul* have similarly concluded that "[i]n order to avoid the operation of a forum selection clause on the basis of fraud, the party resisting the clause must establish that the clause itself, as opposed to the contract as a whole, was the product of fraud." *Andrew v. Power Mktg. Direct, Inc.,* No. 6:07CV4087RBH, 2008 WL 4458865, at *2 (D.S.C. Sept. 29, 2008) (citation omitted); *see also Moses v. Bus. Card Express, Inc.,* 929 F.2d 1131, 1139 (6th Cir. 1991) ("The complaint makes only general allegations concerning fraud in the inducement, and none is specifically related to the choice of law clause. . . . [P]laintiffs produced no authority in support of their claim that such a general claim, without more, can lead to a holding that a choice of law clause is unenforceable[.]").

16

Dicta from several Virginia cases also suggests that under Virginia law evidence of fraud or overreaching must be directed at the contested clause and not the contract as a whole. *See, e.g, Paul Bus. Sys.*, 397 S.E. 2d at 807 ("the party challenging enforcement [must] establish that such *provisions* are unfair or unreasonable, or are affected by fraud or unequal bargaining power" (emphasis added)); *Faltings*, 1988 WL 83316, at *3 ("one of the parties was misled into agreeing to the *provision*" (emphasis added)); *Allen v. Lloyd's of London*, No. 3:96CV522, 1996 WL 490177, at *17 (E.D. Va. Aug. 23, 1996) ("[A] plaintiff seeking to avoid a choice provision on a fraud theory must plead a fraud going to the specific provision."), *rev'd on other grounds*, 94 F.3d 923 (4th Cir. 1996).

In arguing for the opposite conclusion, Plaintiffs rely on *Khosla v. Global Mortg., Inc.,* No. 2006-8458, 2006 WL 3420304, at *2-3 (Va. Cir. Ct. Nov. 8, 2006). In *Khosla*, the trial court determined that because a contract allegedly procured by fraud is itself void, any choice-of-law provision contained therein must be unenforceable regardless if the plaintiff "challenges the contract as a whole." *Id.* at *3. The Court is unconvinced that *Khosla* is correct on this point. Not only did the trial court fail to address the scope of the modern trend specifically adopted in *Paul*, other court have arrived at the opposite conclusion. *See, e.g., Ash-Will Farms, L.L.C.,*

17

2003 WL 22330103, at *3 ("[I]t takes more than the conclusory fraud allegations in the complaints in these cases, none of which are directed specifically at the forum selection clause.").  In light of the analysis above, the Court finds *Ash-Will Farms* more persuasive.

Accordingly, the Court will apply the modern trend that a plaintiff seeking to avoid a choice-of-law provision based on fraud or overreaching must show that the misrepresentation or undue influence "was responsible for the complainant's adherence to the provision."  Restatement (Second) of Conflict of Laws § 201; *see also Malpractice Research, Inc. v. Norman,* No. 92560, 1991 WL 11031257, at *2 (Va. Cir. Ct. May 22, 1991) (citing to the Restatement of Conflict of Laws with approval).  In other words, to avoid the operation of a choice-of-law provision on the basis of overreaching or fraud, as is the case here, the party resisting the clause must establish by clear and convincing evidence that the clause itself, as opposed to the contract as a whole, was the product of impropriety.  *See Ash-Will Farms,* 2003 WL 22330103, at *3; *Global One Commc'n, L.L.C. v. Ansaldi,* No. C165948, 2000 WL 1210511, at *2 (Va. Cir. Ct. May 5, 2000) ("Virginia does not presume the unenforceability of contracts entered into by parties of unequal bargaining power but rather presumes contracts to be valid, and the burden is on the party challenging the validity to establish

18

that the provision in question is unfair, unreasonable, or affected by fraud or unequal bargaining power.").

In this case, Plaintiffs have failed to make the requisite showing to invalidate the choice-of-law provision. First, as the California court correctly noted, Plaintiffs allegations of fraud and overreaching go to the entire contract rather than to the choice-of-law clause in particular. (Transfer Order at 33-34.) Plaintiffs have not stated that GLS affirmatively misled them concerning the legal effect of the choice-of-law provision, nor have they pled that GLS misled them regarding the existence of this clause. Similarly, Plaintiffs' assertions of overreaching and duress relate only to the circumstances under which they purportedly signed their employment contracts as a whole and not the specific choice-of-law provision now in dispute. Such general allegations are insufficient. *See, e.g., Bires v. Waltom, LLC,* No. 1:07CV00959, 2008 WL 2980095, at *3 (M.D.N.C. Aug. 1, 2008) (analyzing forum-selection clause and noting "[t]o show that the forum-selection clause is unreasonable based on fraud, Plaintiff would need to show that inclusion of the forum-selection clause *itself* was the product of fraud or coercion" (citation omitted)); *Petters Co. Inc. v. BLS Sales Inc.,* No. C 04-02160 CRB, 2005 WL 2072109, at *7 (N.D. Cal. Aug. 26, 2005) ("Under the Restatement . . . the choice-of-law clause . . . is given effect over a claim of

duress unless it is claimed that the duress caused assent to the choice-of-law clause itself." (citation omitted)).  Finally, Plaintiffs have presented no evidence to support their claim that the choice-of-law provision is invalid.  Under the modern trend, which the Court finds applicable here, the party challenging the clause must satisfy "a heavy burden" of proof. *See Anchor Seafood, Inc. v. CMA-CGB (Caribbean), Inc.,* No. 05-23097-CIV, 2005 WL 4674292, at *3 (S.D. Fla. May 4, 2005) (citing *Bremen* 407 U.S. at 10).  While the amount of evidence needed to satisfy this burden may be debatable, one thing is certain, it takes more than conclusory allegations in the pleadings, none of which are directed specifically at the choice-of-law provision, as is the case here.  *See Ash-Will Farms,* 2003 WL 22330103, at *3.[6]

Plaintiffs' additional argument that the choice-of-law provision is unenforceable because Virginia law does not "bear a

---

[6]  Plaintiffs' allegations of duress and overreaching are their stronger argument in contesting the choice-of-law provision.  But even looking past the deficiencies noted above, Plaintiffs' accusations are insufficient. Plaintiffs contend that at the time they signed their employment contracts in January 2013 they were "unable to work or travel; and, faced the prospect of being thrown into jail."  (Am. Compl. ¶94.)  Plaintiffs, however, admit that it was not until March 2013 – two months after signing their contracts - that Al Shora falsely accused them of being in the country illegally and took actions that allegedly resulted in them being subject to the threat of arrest by Kuwaiti authorities.  (Am. Compl. ¶ 70.)  As such, Plaintiffs have not "pleaded factual content that allows the court to draw the reasonable inference" that they were in fact virtual prisoners at the time they executed their employment contracts.  *Iqbal*, 556 U.S. at 663.  Plaintiffs' remaining allegations of duress and unequal bargaining power prior to March 2013 are conclusory and themselves insufficient to satisfy the heavy burden described above.  *See, e.g., Pugh v. Arrow Elecs., Inc.,* 304 F. Supp. 2d 890, 894-95 (N.D. Tex. 2003).

reasonable relation to the purpose of the agreement" is similarly flawed.  (Pls.' Opp'n to Mot. to Dismiss [Dkt. 85] at 13); *Wellmore Coal Corp. v. Gates Learjet Corp.,* 475 F. Supp. 1140, 1144 (W.D. Va. 1979) ("A Virginia court, however, might not enforce the governing law clause if there was no reasonable basis for the parties' choice." (citation omitted)).  GLS is based in Northern Virginia and it employs linguists who work in multiple overseas locations.  Under these circumstances, it is reasonable for GLS to choose Virginia law to govern potential disputes with its employees.  *See JDS Uniphase Corp. v. Jennings,* 473 F. Supp. 2d 697, 702 (E.D. Va. 2007) (upholding California choice-of-law provision where the plaintiff was headquartered in California); *see also Senture,* 575 F. Supp. 2d at 727.  As evidenced by their signatures, Plaintiffs were aware that their contracts contained a choice-of-law provision, and while the Court recognizes that Plaintiffs may now prefer to litigate under foreign law, such a desire is insufficient.

The Court's decision to enforce the Virginia choice-of-law provision does not settle this issue, as the parties' also contest its scope.  The disputed provision states, in relevant part, "[t]his Agreement shall be governed by and interpreted under the laws of the Commonwealth of Virginia of the United States of America."  GLS maintains that this language encompasses not only Plaintiffs' contract claims, but also their

21

statutory and tort claims.  (Def.'s Mot. to Dismiss Mem. at 11-14.)  Plaintiffs, predictably, argue that the provision "has a narrow scope" that is "limited only to the construction and interpretation of the Agreement itself."  (Pls.' Opp'n to Mot. to Dismiss at 9.)

The choice-of-law provision in this case clearly mandates the application of Virginia law to Plaintiffs' breach of contract claim, as well as to their contract-based claim for breach of the implied covenant of good faith and fair dealing.  *See Stoney Glen, LLC v. S. Bank & Trust Co.*, 944 F. Supp. 2d 460, 465-66 (E.D. Va. 2013).  The question, then, is whether this clause also requires the application of Virginia law to Plaintiffs' remaining claims.

"Where a choice-of-law clause in the contract is sufficiently broad to encompass contract-related tort claims," Virginia courts will "honor[] the intent of the parties to choose the applicable law" and apply the provision to related, non-contract claims. *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 628 (4th Cir. 1999).  The rationale underlying this rule is straight forward; allowing parties to negotiate the rules that govern their relationship creates certainty and avoids applying the laws of multiple jurisdictions to a controversy having its origin in a single, contract-based relationship.  *See Pyott-Boone,* 918 F. Supp. 2d at 544-45.

22

"Virginia law favors contractual choice of law clauses" and they are generally found to "encompass contract-related tort claims." *Cyberlock Consulting, Inc. v. Info. Experts, Inc.,* 876 F. Supp. 2d 672, 678 (E.D. Va. 2012).

As noted, the choice-of-law provision in this case specifies that "[t]his Agreement shall be governed by and interpreted under the laws of the Commonwealth of Virginia[.]" (*See* Phillips Decl. Ex. 1.)  Virginia courts have found similarly-worded choice-of-law provisions "broad enough to cover tort and contract claims arising from the [a]greement." *Fransmart, LLC v. Freshii Dev., LLC*, 768 F. Supp. 2d 851, 864 n.18 (E.D. Va. 2011).  In *Fransmart*, the court held that an agreement which provided that it would be "interpreted and construed exclusively under the laws of the Commonwealth of Virginia," meant Virginia law applied to contract claims and "contract-related tort claims."  *Id.* at 856-57, 864 n.18; *see also Nw. Airlines, Inc. v. Astraea Aviation Servs., Inc.,* 111 F.3d 1386, 1392 (8th Cir. 1997) (holding that claims for misrepresentation and deceptive trade practices fell within the scope of the parties' choice-of-law provision that specified their agreement would be "governed by and interpreted in accordance with" Minnesota law).  The language used here is sufficiently similar to these cases to compel the same conclusion.

Nevertheless, as Plaintiffs correctly point out, there is persuasive authority in the opposite direction.  For instance, in *Sanchez v. Lasership, Inc.*, Judge Lee was confronted with a choice-of-law provision stating that "[the] Agreement shall be construed according to the laws of the United States and of the Commonwealth of Virginia[.]"  No. 1:12cv246, 2012 WL 3730636, at *5-6 (E.D. Va. Aug. 27, 2012).  After noting the broad language used in the adjacent forum-selection clause, Judge Lee concluded that this choice-of-law provision was effective only to matters of contract interpretation and that Massachusetts law governed the plaintiffs' substantive claims. *Id.; see also Black Box Corp. v. Markham,* 127 F. App'x 22, 25–26 (3rd Cir. 2005) (noting the choice of law provision, which stated "[t]his agreement will be governed by, and construed and enforced in accordance with, the laws of [Pennsylvania]" was, by its own terms, narrowly drafted to encompass only the underlying agreement itself, and not necessarily the entire relationship between the parties); *Estate of Knox v. Wheeler,* No. 2:05-CV-19-PRC, 2005 WL 2043787, at *7 (N.D. Ind. Aug. 25, 2005) (where the contract stated "[t]his Agreement shall be governed by and interpreted under the laws of the State of Ohio," the district court determined that the contract did not provide a clear indication that the parties intended the choice of law clause in the contract to govern tort claims).

Having considered the authorities cited by both parties, the Court is convinced that the choice-of-law provision in this case is properly interpreted to cover all claims arising out of the parties' relationship and not just Plaintiffs' contract claims.  The Court is particularly persuaded by Judge Jones's recent decision in *Pyott-Boone*, wherein he provided a thorough discussion of the issue of whether choice-of-law provisions should be deemed to encompass torts and other non-contract claims.  918 F. Supp. 2d at 544-47.

After observing that the Virginia Supreme Court has found contractual choice-of-law clauses enforceable because such provisions effectuate the contracting parties' intent, Judge Jones noted "[a district] court interpreting one of these provisions, therefore, should always be guided primarily by its effort to effectuate the intent of the parties[.]"  *Pyott-Boone*, 918 F. Supp. 2d at 544.  With this in mind, Judge Jones rejected the formalistic approach often followed by courts that focuses on the language of the clause in favor of a rule that "the scope of a choice-of-law provision should, absent a showing of intent otherwise, be read to encompass all disputes that arise from or are related to an agreement."  *Id.* at 545.  Judge Jones opined that this latter presumption is more in line with the modern reality that parties executing these contracts intend to cover more than mere contract claims.  *See id.* at 544 ("When a

rational businessperson enters into an agreement establishing a transaction or relationship and provides that disputes arising from the agreement shall be governed by the law of an identified jurisdiction, the logical conclusion is that he or she intended that law to apply to *all* disputes arising out of the transaction or relationship." (citation omitted)).  Judge Jones offered a number of policy reasons for this conclusion, which this Court agrees are sound.  *See id.* at 545.

The above principles counsel in favor of a broad interpretation.  The disputed Virginia choice-of-law provision is contained within a larger "Governing Law" paragraph which includes a forum-selection clause designating Virginia as the forum for all causes of action asserted by Plaintiffs "against the[ir] Employer." (*See* Phillips Decl. Ex. 1.)  The "Governing Law" paragraph, in turn, lies within GLS's comprehensive foreign service agreement, which sets forth all the terms and conditions applicable to Plaintiffs' overseas employment with GLS.  When viewed in this context, the choice-of-law provision manifests the intent to reduce uncertainty and proceed in one forum under one body of law.  *See Signature Flight Support Corp. v. Landow Aviation Ltd. P'ship*, 698 F. Supp. 2d 602, 618 (E.D. Va. 2010) ("When interpreting any part of a contract, this Court must construe the contract as a whole" and "'gather the intent of the parties and the meaning of the language . . . from an

26

examination of the entire instrument[.]"). Under these
circumstances, it would be unreasonable to conclude that a
rational employer like GLS "'would intend that the laws of
multiple jurisdictions would apply to a single controversy
having its origin in a single, contract-based relationship.'"
*Pyott-Boone,* 918 F. Supp. 2d at 544 (citation omitted). The
only reasonable inference is that the parties intended to
provide for an efficient and businesslike resolution of possible
future disputes by choosing a single forum and a single body of
law to govern all claims, irrespective of where the events
giving rise to those claims occurred. Had the parties wished
"to exclude causes of action arising in tort or by statute from
the coverage of their agreement, they may [have] do[ne] so, but
they should [have] reflect[ed] that intent in their contract."
*Id.* at 545. There is no evidence of such intent in this case,
and thus the choice-of-law provision must be found to apply not
only to Plaintiffs' contract claims, but also to any tort and
statutory claims that "arise under" the parties' contractual
relationship. *Paul Bus. Sys.,* 240 Va. at 344. Accordingly, the
Court will now turn to whether Plaintiffs' remaining claims fall
under this rubric.

The Court agrees with GLS that Plaintiffs' pending
tort claims arise from the parties' contractual relationship,
and hence they are governed by the Virginia choice-of-law

27

provision.  *See Cyberlock,* 876 F. Supp. 2d at 677 n.3
(concluding the plaintiff's fraud claim fell under the choice-
of-law clause since it "ar[ose] from the parties' dealings in
connection with the [agreement]").  First, although Plaintiffs
challenge GLS's interpretation of the scope of the choice-of-law
provision, they proceed to offer only Virginia case law in
support of their tort claims, thereby conceding that Virginia
law applies.  (*See* Pls.' Opp'n to Mot. to Dismiss at 13-22.)  In
any event, Plaintiffs' common law tort claims are based on GLS's
conduct as their employer in Kuwait, which has its basis in
Plaintiffs' employment contracts.  In other words, Plaintiffs'
tort claims "arise as a direct result of the relationship
between the parties created by agreements containing a" choice-
of-law provision, and therefore Virginia law will apply.
*Fryfogle v. First Nat. Bank of Greencastle*, No. 6:07cv00035,
2009 WL 700161, at *4 (W.D. Va. Mar. 17, 2009); *see also Bans
Pasta, LLC v. Mirko Franchising, LLC,* No. 7:13-cv-00360-JCT,
2014 WL 637762, at *8, 12-13 (W.D. Va. Feb. 12, 2014) (applying
Georgia choice-of-law provision to tort claims arising out of
franchise agreement).

           This reasoning is equally applicable to Plaintiffs'
statutory claim under Count 11, in which Plaintiffs allege
violations of Kuwaiti labor law regarding overtime, holiday, and
vacation pay.  These violations are inherently employment-based

claims, which arise from the parties' contractual relationship. Furthermore, Plaintiffs' employment contracts were intended to govern the terms and conditions of their employment with GLS. Plaintiffs' claims under Count 11 thus have a logical nexus with their employment agreements. Accordingly, the choice-of-law provision applies. *See WTM, Inc. v. Henneck,* 125 F. Supp. 2d 864, 867-68 (N.D. Ill. 2000) (noting that statutory claims relating to a contract are governed by the parties' choice of law); *Volvo Trademark Holding Aktiebolaget v. CLM Equip. Co.,* 236 F. Supp. 2d 536, 551 (W.D.N.C. 2002) (finding that the parties' choice-of-law provision displaced the plaintiff's claim under the Arkansas Franchise Practices Act), *rev'd on other grounds,* 386 F.3d 581 (4th Cir. 2004); *Freedman v. Am. Online, Inc.,* 325 F. Supp. 2d 638, 653-54 (E.D. Va. 2004) (applying Virginia choice-of-law provision to the plaintiff's statutory claim under Connecticut law). Furthermore, considering Plaintiffs' employment contracts as a whole reveals that the parties did not intend to be bound by Kuwait's labor laws. The contracts unequivocally state that "the Employee is not eligible for any form of overtime compensation during the term of this Agreement." (*See* Phillips Decl. Ex. 1 at 1.) The contracts also indicate that Plaintiffs' positions are salaried, their "standard work schedule shall be 12 hours per day, 6 days per week," and the "scheduling of work hours may be more or less

29

than 72 hours per week, at the sole discretion of the employer." (*Id.* at 11.)  These provisions do not reflect any intention to be bound by Kuwait's laws restricting the number of hours worked and requiring overtime compensation, and are thus inconsistent with the narrow interpretation of the choice-of-law provision that Plaintiffs advance.  By contrast, interpreting the choice-of-law provision to encompass Plaintiffs' statutory claims is entirely consistent with these provisions, as well as with GLS's rational aim to have a single body of law govern all claims, irrespective of where the events giving rise to those claims occurred.

### B. GLS's Motion to Dismiss

Having determined what law to apply, the Court will turn to GLS's Motion to Dismiss.  Each of Plaintiffs' claims are addressed in turn below.

### Count 1 – False Imprisonment

Under Virginia law, false imprisonment is defined as the restraint of a person's liberty without sufficient cause. *Zayre of Va., Inc. v. Gowdy,* 207 Va. 47, 50 (1966).  "If a person is under a reasonable apprehension that force will be used unless he willingly submits, and he does submit to the extent that he is denied freedom of action, this, in legal contemplation, constitutes false imprisonment."  *Id.*  "To maintain an action for false imprisonment it is not necessary to

show malice, ill will or the slightest wrongful intention, and neither the good faith of a defendant nor that of his employee will defeat a plaintiff's right to recover." *Id.*

In this case, Plaintiffs claim that "GLS directly imposed by physical barriers and by means of unreasonable duress unlawful restraint upon Plaintiffs' freedom of movement, to wit by barring Plaintiffs and Class members from leaving the Army bases[.]" (Am. Compl. ¶ 62.) Plaintiffs specifically allege that upon their arrival in Kuwait GLS confiscated their passports and "prohibited [them] from working or leaving the Camps for medical appointments, personal time or even emergency matters." (*Id.* at ¶ 19.) Accepting these allegations as true and construing all inferences in Plaintiffs' favor, the Court is compelled to find that the Amended Complaint, although scant, sufficiently states a claim for false imprisonment against GLS. *See Trull v. Smolka,* No. 3:08CV460-HEH, 2008 WL 4279599, at *7 (E.D. Va. Sept. 18, 2008) (finding claim of false imprisonment sufficiently pled where plaintiff alleged "[d]efendants required him to exit his home and ride to the hospital in an ambulance" and "he was afraid to disregard the [d]efendants' words, acts and/or threats").

GLS's argument that this claim fails because "Plaintiffs have not plausibly alleged that GLS - as opposed to Al Shora or Kuwaiti officials - '*directly restrained*' them" is

31

unpersuasive in light of the allegations above.  (Def.'s Mot. to
Dismiss Mem. at 21.)  While indirect restraint is indeed
insufficient, *see Harbeck v. Smith,* 814 F. Supp. 2d 608, 621
(E.D. Va. 2011), Plaintiffs' specifically allege that GLS
prohibited them from leaving the Army facilities.  GLS's
contention that they had legal cause to restrict Plaintiffs'
movements is similarly unsuccessful.  (*See* Def.'s Mot. to
Dismiss Mem. at 22.)  "To survive dismissal under Rule 12(b)(6),
[p]laintiff must merely allege that he was unlawfully detained;
under Virginia law, the defendant bears the burden of proving an
adequate justification for the detention."  *Trull,* 2008 WL
4279599, at *7 (citing *Figg v. Schroeder,* 312 F.3d 625, 642 (4th
Cir. 2002)).  Plaintiffs have sufficiently stated a claim that
GLS restricted their freedom of movement.  "To assess the
validity of an affirmative defense is beyond the scope of Rule
12(b)(6) review, which is confined to a determination of the
facial sufficiency of the [c]omplaint."  *Id*.

Because Plaintiffs have stated at least a sufficiently
plausible claim of false imprisonment to survive dismissal under
Rule 12(b)(6), the Court will deny GLS's motion as it relates to
Count 1.

### Count 2 – Negligent Hiring and Retention

Virginia law recognizes a cause of action for the
negligent hiring of either an employee or an independent

contractor.  *See Jones v. C.H. Robinson Worldwide, Inc.,* 558 F. Supp. 2d 630, 639 (W.D. Va. 2008).  "The test is whether the employer has negligently placed 'an unfit person in an employment situation involving an unreasonable risk of harm to others.'"  *Morgan v. Wal-Mart Stores E., LP,* No. 3:10CV669-HEH, 2010 WL 4394096, at *3 (E.D. Va. Nov. 1, 2010) (citation omitted).  "Specifically, an employer is liable for negligent hiring where the employer fails 'to exercise reasonable care in placing an individual with known propensities, or propensities that should have been discovered by reasonable investigation, in an employment position in which . . . it should have been foreseeable that the hired individual posed a threat of injury to others.'"  *Id.* (citation omitted)

Here, Plaintiffs allege that GLS "negligently and carelessly selected their agents . . . including, but not limited to, their sponsoring company, Al Shora and KRH."  (Am. Compl. ¶ 66.)  According to Plaintiffs, "Al Shora turned over the names of GLS's employees to Kuwaiti immigration authorities; declared them absent from work; and, in violation of their working visas.  Consequently Plaintiffs and Class members' work visas were cancelled, and they were placed on Kuwaiti's 'blacklist' for arrest and/or deportation."  (*Id.* at ¶ 70.)  As explained below, Plaintiffs have failed to allege a plausible claim under this theory.

33

First, Plaintiffs fail to specify what actions of GLS constituted a breach of the legal duty to hire suitable employees/agents.  Plaintiffs do not, for example, allege that GLS "failed to investigate its . . . [sponsors'] backgrounds prior to hiring," and/or that such an investigation would have uncovered that Al Shora had a "known propensity" for posing a "threat of injury to others." *Morgan,* 2010 WL 4394096, at *3. Instead, Plaintiffs' pleadings are "replete with bald assertions and legal conclusions." *Id.*  Consequently, Plaintiffs' claim is insufficient.  *Id.*

Furthermore, Plaintiffs have failed to plead a serious physical injury resulting from GLS's allegedly negligent hiring. "Liability based on a negligent hiring or retention theory in Virginia is premised on a situation involving 'an unreasonable risk of harm to others.'" *Griffith v. Wal-Mart Stores E., L.P.,* No. 6:12-CV-00011, 2012 WL 5465501, at *11 (W.D. Va. Aug. 24, 2012).  "[T]he Virginia Supreme Court has determined that 'an unreasonable risk of harm' element requires the threat of serious and significant physical injury." *Parker v. Geneva Enters., Inc.,* 997 F. Supp. 706, 713 (E.D. Va. 1997). Plaintiffs' allegations regarding "mental anguish, emotional distress, [and] pain and suffering," (Am. Compl. ¶ 72), constitute "run-of-the-mill emotional distress language" that

34

"falls woefully short of alleging a [serious] physical injury."
*Griffith,* 2012 WL 5465501, at *11.

Finally, the Court agrees with GLS that the Defense
Base Act ("DBA") bars this claim.  The DBA provides workers'
compensation insurance for injuries an employee sustains while
"engaged in any employment . . . at any military, air, or naval
base acquired after January 1, 1940, by the United States from
any foreign government."  42 U.S.C. § 1651(a).  The DBA defines
"injury" as "'accidental injury or death arising out of and in
the course of employment . . . includ[ing] an injury caused by
the willful act of a third person directed against an  employee
because of his employment.'"  *Mason v. Sallyport Global
Holdings, Inc.,* No. 1:13–cv–1134, 2013 WL 6504625, at *1 (E.D.
Va. Dec. 9, 2013) (quoting 33 U.S.C. § 902).  Where the DBA
applies, "it displaces any common law causes of action an
employee might otherwise have."  *Id.*

In a recent opinion from this Court*,* Judge Trenga held
that the DBA displaced a plaintiff's negligent hiring claim
based on an assault by another employee where the plaintiff did
"not allege that [the employer] in any way directed the assault
or intended for it to take place." *Mason,* 2013 WL 6504625, at
*1.  As in *Mason*, Plaintiffs here allege only that GLS "acted
negligently and carelessly in the selection of their sponsors,"
(Am. Compl. ¶ 71), and not that GLS directed or intended for Al

35

Shora to falsely accuse Plaintiffs of being in the country illegally.  Accordingly, in agreement with Judge Trenga, the undersigned finds that the DBA displaces Plaintiffs' negligent hiring claim.  *See Mason,* 2013 WL 6504625, at *1.

### Count 3 – Intentional Infliction of Emotional Distress

"In order to state a claim for intentional infliction of emotional distress, a Virginia litigant must plead factual allegations tending to show that: (1) the wrongdoer's conduct was intentional or reckless; (2) that his conduct was outrageous and intolerable, offending the generally accepted standards of decency and morality; (3) that there is a causal connection between the conduct and the emotional distress; and (4) that the resulting emotional distress was severe." *Ortiz v. Panera Bread Co.,* No. 1:10CV1424, 2011 WL 3353432, at *6 (E.D. Va. Aug. 2, 2011) (citing *Womack v. Eldridge,* 215 Va. 338 (1974)).  "Because injury to the mind or emotions can be easily feigned, actions for intentional infliction of emotional distress are not favored in Virginia." *Michael v. Sentara Health Sys.,* 939 F. Supp. 1220, 1233 (E.D. Va. 1996).  When evaluating a claim for intentional infliction of emotional distress, "[i]t is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery[.]" *Womack,* 215 Va. at 342.

To satisfy the second element of this claim, a plaintiff must allege conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Russo v. White,* 241 Va. 23, 27 (1991) (citation omitted). This element "cannot be satisfied by [merely] alleging that the defendant's behavior was tortuous, or even criminal." *Ortiz,* WL 3353432, at *6. Plaintiffs' allegations fall far short of this standard.

Here, Plaintiffs assert that GLS's actions with regard to its alleged "false imprisonment" of Plaintiffs "constitutes extreme and outrageous conduct." (Am. Compl. ¶ 74.) Even accepting these allegations as true, Plaintiffs have not plausibly shown how their alleged confinement to a U.S. military base was unreasonable — much less "extreme and outrageous" — given their admission that they would have been arrested and imprisoned if they had left. (*See id.* ¶ 28(k)-(l).) No reasonable jury could conclude that GLS's actions in question were so extreme or outrageous as to impute liability under these circumstances. *See Ruth v. Fletcher,* 237 Va. 366, 377 (1989) (noting that claims of intentional infliction of emotional distress should be "tightly controlled by the courts"); *Harris v. Kreutzer,* 271 Va. 188, 204 (2006) (commenting that actions for intentional infliction of emotional distress are not favored

37

in Virginia); *Warner v. Buck Creek Nursery, Inc.,* 149 F. Supp.
2d 246, 265 (dismissing an intentional infliction of emotional
distress claim because the allegedly false statements defendant
made that plaintiff was fired for theft in order to destroy
plaintiff's reputation in the community were insufficient to
demonstrate the level of outrageousness required under Virginia
law).

Even assuming, without deciding, that a reasonable
jury could find in Plaintiffs' favor for the first three
elements, Plaintiffs' claim must fail because they have not
shown they suffered the emotional distress required to meet the
final element.  With respect to this element, "liability arises
only when the emotional distress is extreme, and only where the
distress inflicted is so severe that no reasonable person could
be expected to endure it."  *Russo,* 241 Va. at 27.  In *Russo,* the
plaintiff attempted to support her claim by alleging "she was
nervous, could not sleep, experienced stress and its physical
symptoms, withdrew from activities, and was unable to
concentrate at work."  *Id.* at 28.  The Virginia Supreme Court
ruled that plaintiff's allegations were deficient because she
had no objective physical injury caused by the emotional
distress, sought no medical attention for it, was not confined
in a hospital or at home, and had no income loss.  *Id.; see also
Michael,* 939 F. Supp. at 1234 (dismissing claim for intentional

38

inflliction of emotional distress where plaintiff did not allege that she sought medical treatment, ceased functioning normally, or that the stress caused her any objectively verifiable physical or emotional injury).  In this case, Plaintiffs allege they have suffered "severe emotional distress, anxiety, pain and suffering, inconvenience, physical injuries, [and] physical sickness[.]"  (Am. Compl. ¶ 75.)  As the cases above demonstrate, these bare and conclusory assertions are insufficient.  *See Ortiz*, 2011 WL 3353432, at *7.  Accordingly, the Court will grant GLS's motion as to this count.

### Count 4 - Negligent Infliction of Emotional Distress

The standard for negligent infliction of emotional distress is even more rigorous than the standard for intentional infliction of emotional distress.  To survive a motion to dismiss on a claim for negligent infliction of emotional distress without physical impact, as is the case here, a plaintiff must plead that the conduct caused the plaintiff both emotional disturbance and physical injury.  *See Myseros v. Sissler,* 239 Va. 8, 12 (1990); *Hughes v. Moore,* 214 Va. 27, 34 (1973).  A plaintiff must allege "actual physical injury as 'the natural result of fright or shock proximately caused by the defendant's negligence.'"  *King v. City of Chesapeake*, 478 F. Supp. 2d 871, 874 (E.D. Va. 2007) (citation omitted).

39

Here, Plaintiffs assert that GLS "acted negligently
and carelessly in . . . the selection of [its] sponsors," and
that as a result, they "suffered severe emotional distress,
anxiety, pain and suffering, physical injuries, physical
sickness, inconvenience, [and] humiliation." (Am. Compl. ¶¶ 79-
80.) First, as discussed above, Plaintiffs have failed to
allege sufficient facts to evidence that GLS acted negligently
in retaining Al Shora. *See Robertson v. Prince William Hosp.*,
No. 1:11cv820, 2012 WL 1448101, at *6 (E.D. Va. Apr. 25, 2012)
(dismissing claim for negligent infliction of emotion distress
where the plaintiff failed to plausibly allege that the
defendant was negligent). Additionally, Plaintiffs' have not
adequately pled an actual physical injury resulting from their
alleged emotional distress. Plaintiffs' threadbare assertions
of "physical injuries" and "physical sickness" are not
sufficient to state a claim for negligent infliction of
emotional distress. *See Elrod v. Busch Entm't Corp.*, Nos.
4:09cv164, 4:09cv165, 4:09cv166, 2010 WL 5620918, at *6 (E.D.
Va. Dec. 14, 2010) ("[M]erely alleging physical pain is not
factually specific enough to satisfy the *Iqbal* and *Twombly*
standard. 'Physical pain,' especially when referring to three
separate plaintiffs, is boiler-plate language, which fails to
sufficiently outline the three plaintiffs' physical injuries
resulting from emotional distress."), *report and recommendation*

40

*adopted by,* 2011 WL 166316 (E.D. Va. Jan. 19, 2011); *Michael,* 939 F. Supp. at 1234 (finding plaintiff's conclusory claim that "she suffers from emotional and mental disturbance resulting in physical harm" insufficient).  Accordingly, the Court will dismiss this claim.

**Count 5 – Fraud**

"The elements for actual fraud are: '(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party mislead, and (6) resulting damage to the party misled.'" *Girgis v. Salient Solutions, Inc.,* No. 1:11-CV-1287, 2012 WL 2792157, at *12 (E.D. Va. July 9, 2012) (citation omitted). Concealment of a material fact may support a fraud claim under Virginia law only if a party makes a "knowing and deliberate decision not to disclose a material fact," and the concealing party "knows that the other party is acting upon the assumption that the fact does not exist." *Id.* at *15.

"In alleging fraud . . . a party must state with particularity the circumstances constituting fraud or mistake," but intent and other conditions of a person's mind may be alleged generally.  Fed. R. Civ. P. 9(b).  At minimum, a plaintiff alleging fraud must describe "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained

41

thereby." *U.S. ex rel. Wilson v. Kellog Brown & Root, Inc.,* 525
F.3d 370, 379 (4th Cir. 2008) (citation omitted).  "When the
fraud alleged is based on an omission of material fact, Rule
9(b) requires that plaintiffs plead the type of facts omitted,
the place in which the omission should have appeared, and the
way in which the omitted facts made the defendant's affirmative
representations misleading." *Morris v. Wachovia Sec., Inc.,* 277
F. Supp. 2d 622, 645 (E.D. Va. 2003).  "In assessing whether a
plaintiff has satisfied the requirements of Rule 9(b), courts
must be mindful that the principle purpose behind the rule is to
prevent strike suits.  Thus, while mere incantation of the word
'fraud' is clearly insufficient, Rule 9(b) does not require a
dissertation." *Id.* (citations omitted).

Here, Plaintiffs allege that GLS purposefully failed
to disclose an ongoing dispute with Al Shora regarding
Plaintiffs' sponsorship status.  According to Plaintiffs, "[a]t
the time GLS had [them] sign the 2013 contract, GLS's employment
of Plaintiffs in Kuwait was unlawful since GLS was unable to
obtain Al Shora's agreement to continue sponsoring Plaintiffs
for GLS or to transfer their sponsorship to another Kuwaiti
entity." (Am. Compl. ¶ 28(d).)  Specifically, the Amended
Complaint asserts:

- [S]ubsequent to Plaintiffs and Class members' arrival
  to Kuwait, GLS . . . re-bid their sponsorship

42

contract.   GLS severed their ties with their sponsor, Al Shora, in favor of a new Kuwaiti company, KRH.

- GLS did not obtain the transfer of Plaintiffs' Kuwaiti sponsorship from Al Shora as required prior to the termination of the Al Shora contract on December 5, 2012. GLS, at that point, knew that its employees were in jeopardy under Kuwaiti law since they were technically employees of Al Shora.   But GLS was more interested in continuing to profit off the services of these employees and left them in place, had them sign the 2013 Contract and, most importantly, concealed from them the facts which would have alerted them about their legal status and the jeopardy they were under.

- In switching sponsors . . . GLS created a legal dispute with Al Shora that it knew would place its employees in harm's way.

- GLS's conduct in having Plaintiffs sign employment agreements and continue to provide services that GLS profited from when GLS knew that Plaintiffs were not being sponsored and when GLS knew that it could not compel Al Shora to transfer its sponsorship resulted in Plaintiffs' eventual confinement.

- Plaintiffs were fraudulently induced by GLS to enter into the 2013 Contracts and would not have entered into the 2013 Contracts had they known that there was a sponsorship dispute between GLS and Al Shora.

- GLS's ability to secure Kuwaiti sponsorship for Plaintiffs was material to GLS's lawful employment of Plaintiffs.

(*See* Am. Compl. ¶¶ 33, 68-69, 83-84, 88.)  In conjunction with the rest of the Amended Complaint, the Court finds these allegations sufficient to meet both the state and federal requirements for a claim of fraud by omission.  *See Lamberty v.*

*Premier Millwork & Lumber Co., Inc.,* 329 F. Supp. 2d 737, 744
(E.D. Va. 2004); *Morris,* 277 F. Supp. 2d at 645.

In its brief, GLS argues that the material omission in
dispute is "that GLS did not have a sponsor in place at the time
GLS had Plaintiffs sign the 2013 [contract]." (*See* Def.'s Mot.
to Dismiss Mem. at 17.)  Thus, concludes GLS, because
"Plaintiffs' own allegations demonstrate that GLS *did* have a
sponsor in place for its employees at the time that Plaintiffs
signed their 2013 [contract]" this claim must fail. (*Id.* at 18
(emphasis in original).)  GLS's attempt to narrow this claim to
the specific issue of whether it had another local sponsor in
place is at odds with the Amended Complaint, which specifically
claims that GLS failed to disclose there "was a sponsorship
dispute between GLS and Al Shora." (Am. Compl. ¶ 88.)

GLS's argument that any omission on its behalf was not
material is similarly unpersuasive. *See Girgis,* 2012 WL
2792157, at *15 (noting that a claim for fraud by concealment
only lies where the alleged omission was a material fact).  Al
Shora was in possession of Plaintiffs' work papers and foreign
workers in Kuwait need a local sponsor to remain in the country.
Accordingly, this dispute, which resulted in Al Shora refusing
to permit GLS to transfer to another sponsor and "blacklisting"
Plaintiffs, was plainly material.  Accordingly, GLS's motion to
dismiss as to this claim will be denied.

### Count 6 – Rescission

In this count, Plaintiffs seek to invalidate the Virginia forum-selection clause and Virginia choice-of-law provision in their contracts.  (*See* Am. Compl. ¶¶ 93-96.) Because the California court has already upheld the forum-selection clause, and because the choice-of-law provision is enforceable for the reasons explained above, Count 6 will be dismissed.

### Count 7 – Promissory Fraud

"'Because fraud must involve a misrepresentation of a present or a pre-existing fact, fraud ordinarily cannot be predicated on unfulfilled promises or statements regarding future events.'"  *Girgis,* 2012 WL 2792157, at *12 (quoting *Supervalu, Inc. v. Johnson,* 276 Va. 356, 367 (2008)).  But "if a defendant makes a promise that, when made, he has no intention of performing, that promise is considered a misrepresentation of present fact and may form the basis for a claim of actual fraud." *Supervalu, Inc.,* 276 Va. at 368.  To satisfy the pleading standard for fraud under such a theory, a plaintiff must clearly allege a contemporaneous intent not to perform at the time a fraudulent statement is made.  *See Station # 2, LLC v. Lynch,* 280 Va. 166, 172 (2010).

Under this count, Plaintiffs allege that "GLS affirmatively promised Plaintiffs and the Class members that

45

they would . . . secure a Kuwaiti sponsorship on their behalves"
and "be afforded ten-percent hardship pay; per diem for meals;
30-days of vacation; adequate healthcare; and, 'completion
payments' bonuses." (Am. Compl. ¶¶ 98-99.) According to
Plaintiffs' "GLS's representations as set forth above were false
and fraudulent, GLS knew that the representations were false and
fraudulent at the time they were made, and GLS did not intend to
honor these representations." (*Id.* at ¶ 100.) These
allegations are insufficient. First, even assuming these
promises were made, Plaintiffs have asserted no facts tending to
show that GLS had no intention of fulfilling these obligations.
Significantly, the "mere failure to perform" is "generally not
evidence of a lack of intent to perform at the time" the promise
was made. *Cyberlock Consulting, Inc. v. Info. Experts, Inc.*,
876 F. Supp. 2d 672, 681 (E.D. Va. 2012). Moreover, even if
there were an actionable fraudulent promise, the Amended
Complaint is entirely lacking in particularized facts describing
the "who, what, when, where, and how" regarding that promise.
*Girgis*, 2012 WL 2792157, at *12. Accordingly, the Court will
grant GLS's motion as to Count 7.

### Count 8 – Negligent Misrepresentation

In this count, Plaintiffs' seek to hold GLS liable for
several promises made after they arrived in Kuwait and before
they signed the new employment agreements. (Am. Compl. ¶¶ 104-

09.)  This claim is easily dealt with because Virginia "does not recognize a general cause of action for negligent misrepresentation."  *Lescs v. William R. Hughes, Inc.,* No. 97-2278, 1999 WL 12913, at *10 (4th Cir. Jan. 14, 1999); *see also JTH Tax, Inc. v. Whitaker,* No. 2:07cv170, 2007 WL 2821830, at *3 (E.D. Va. Sept. 27, 2007).  Accordingly, this claim will be dismissed.

### Count 9 – Breach of Contract

In Virginia, "[t]he elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation."  *Sunrise Continuing Care, LLC v. Wright,* 277 Va. 148, 154 (2009) (citations and internal quotation marks omitted).  It is undisputed that a contract exists between the parties in this case, and, for purposes of this motion, GLS does not contest the issue of damages.  Accordingly, the only point of contention is whether Plaintiffs have sufficiently alleged breach.

First, Plaintiffs claim that GLS breached its duty to provide them with transportation out of Kuwait upon their request to terminate their employment.  (Am. Compl. ¶¶ 110-13.)  Under the applicable contracts, however, GLS does not have an unqualified obligation to provide Plaintiffs with transportation

immediately upon their request for curtailment of their assignment.  In fact, the contracts expressly warn Plaintiffs that "[t]ravel could be significantly restricted, delayed or made more difficult by operational requirements of the military or by restrictions imposed by civil authorities or the Employer[.]" (Phillips Decl. Ex. 1 at 4.)  Since GLS had no duty to provide Plaintiffs with immediate passage out of Kuwait, Plaintiffs' assertion that GLS breached the contract by failing to provide them with such transportation fails.  Plaintiffs' contention that the several months delay in arranging their transport constitutes a breach is also denied.  Plaintiffs' allegations do not rise to the level of a plausible claim when the contract provides that travel could be delayed and, by Plaintiffs' own admission, such restrictions were adopted to prevent their arrest by Kuwaiti authorities.  Simply put, Plaintiffs have failed to allege "a claim to relief that is plausible on its face." *Iqbal,* 556 U.S. at 678; *see also Car Pool LLC v. Hoke,* No. 3:12cv511-JAG, 2012 WL 4854652, at *5 (E.D. Va. Oct. 11, 2012) (denying breach of contract claim where factual allegations did "not support a plausible claim for breach").

Second, Plaintiffs allege that GLS violated its contractual obligation to pay them in accordance with Kuwaiti law.  (Am. Compl. ¶¶ 114-15.)  As discussed above, however,

48

Plaintiffs' employment contracts contain no such obligation. Indeed, many of the provisions provide just the opposite. Plaintiffs may not assert that GLS was obligated to pay them in accordance with Kuwaiti law simply because the agreements state that an "[e]mployee must comply with all laws and regulations of 'host country.'" (*See* Am. Compl. ¶¶ 40-52.) The fact that GLS *employees* must abide by Kuwaiti law while in country does not mean that the terms and conditions of their employment are governed by these laws; especially where, as here, Plaintiffs' contracts contain a clear Virginia choice-of-law provision.

Having failed to allege a plausible claim for breach of contract, the Court will grant GLS's motion as to Count 9.

### Count 10 – Breach of Implied Covenant of Good Faith and Fair Dealing

In Count 10, Plaintiffs assert that their "employment contract contained an implied covenant of good faith and fair dealing" that GLS breached, resulting in the "destruction of Plaintiffs and Class members' valuable property interests in their job and profession," "loss of earnings, bonuses, deferred compensation, and other employment benefits[.]" (Am. Compl. ¶¶ 119-20, 123.) These allegations fail to state a claim as a matter of law because Virginia "does not recognize a cause of action for breach of an implied covenant of good faith and fair dealing in employment contracts, and in at-will employment

49

contracts in particular." *See Devnew v. Brown & Brown, Inc.,*
396 F. Supp. 2d 665, 671 (E.D. Va. 2005); *see also Mickens v.*
*Lockheed Martin Corp. Mission Sys. & Sys. (MS2),* No. 1:11cv1117,
2012 WL 2673148, at *2 n.5 (E.D. Va. July 5, 2012), *aff'd,* 501
F. App'x 266 (4th Cir. 2012).  Plaintiffs' argument that
Virginia law recognizes "the existent of an implied covenant of
good faith in *the performance* of an at-will employment
contract," (Pls.' Opp'n to Mot. to Dismiss at 17), is
unsupported by any authority and directly contrary to the
relevant case law.  *See Taha v. L3 Commc'ns Corp.,* No.
1:09CV720, 2009 WL 3837278, at *1, *4 & n.6 (E.D. Va. Nov. 13,
2009); *Devnew,* 396 F. Supp. 2d at 271 (noting that the court "is
simply not empowered to broaden the scope of an implied covenant
of good faith and fair dealing from the commercial context to
the employment context" (citation omitted)).  Accordingly, this
claim will be dismissed.[7]

_____

[7]  During the hearing on this matter, Plaintiffs' counsel cited the case
*CaterCorp, Inc. v. Catering Concepts, Inc.,* 246 Va. 22 (1993) for the
position that Virginia does in fact recognize an implied covenant of good
faith and fair dealing in employment contracts.  Plaintiffs' have since filed
a motion asking the Court to consider this supplemental authority. (*See*
Pls.' Mot. to Submit Supplemental Authority [Dkt. 97] at 1.)  The Court will
grant Plaintiffs' motion, but this case does nothing to change the Court's
conclusion above.  In *CaterCorp,* the Virginia Supreme Court held that the
plaintiff-employer adequately alleged that one of the defendant-employees
breached "the duties of good faith and fair dealing" owed by the employee to
the employer by encouraging another employee to violate the terms of his
employment agreement.  246 Va. at 28-29.  *CaterCorp* thus stands only for the
basic proposition that an employee owes his employer a common law duty of
loyalty.  *See Station # 2,* 280 Va. at 175.  Despite Plaintiffs' assertion
otherwise, *Catercorp* does not purport to establish an implied covenant of
good faith and fair dealing in the instant context.  The Fourth Circuit and
this Court have been clear on this issue, and absent an intervening Virginia

## Count 11 – Violation of Kuwaiti Labor Law

Lastly, Plaintiffs allege violations of Kuwaiti labor law regarding overtime, holiday, and vacation pay.  (Am. Compl. ¶¶ 126-32.)  This claim fails because, as noted above, the parties have validly contracted to refer to a different body of law – Virginia – to govern disputes concerning the terms and conditions of Plaintiffs' employment with GLS.  Plaintiffs, therefore, may not state such a claim under Kuwaiti law.  *See Freedman,* 325 F. Supp. 2d at 653-54 (E.D. Va. 2004) (dismissing claims "under Connecticut statutory law" based on applicable Virginia choice-of-law provision).

Plaintiffs' assertion that a choice-of-law provision cannot nullify a statutory claim under foreign law is simply not the case.  *See Pyott-Boone,* 918 F. Supp. 2d at 544-45 (finding the parties' choice of law provision displaced plaintiff's claims under the Virginia Securities Act).  While a Virginia court can decline to honor a choice-of-law provision if application of the chosen law will usurp a statutory claim that is a fundamental policy of a state which has a materially greater interest in the litigation, *see Malpractice Research, Inc.,* 1991 WL 11031257, at *2, Plaintiffs have presented no compelling argument that is the case here.  Plaintiffs' brief is

decision which repudiates the Fourth Circuit and this Court's interpretation of Virginia law, the Court will apply that interpretation.

devoid of any claim that the Kuwaiti labor laws cited above
represent a fundamental policy of the contracting state such
that they cannot be waived through a choice-of-law provision.
*See Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co., Inc.*,
386 F.3d 581, 607 (4th Cir. 2004) ("[W]e begin with the
proposition that not every statutory provision constitutes a
fundamental policy of a state."). Moreover, Plaintiffs have
made no showing that applying the choice-of-law provision to
these claims would be unfair or unreasonable. *See Senture, LLC,*
575 F. Supp. 2d at 727. Accordingly, the Court will not upset
the parties' agreements and Virginia law shall govern.

**B. Plaintiffs' Request for Leave to Amend**

At the conclusion of their opposition brief,
Plaintiffs ask for leave to amend should the Court rule in GLS's
favor. (*See* Pls.' Opp'n to Mot. to Dismiss at 26.) GLS opposes
this request.

A party may amend its pleading once as a matter of
course, but after the first amendment, the party must obtain
written consent from the opposing party or leave of court. Fed.
R. Civ. P. 15(a)(1). Rule 15 of the Federal Rules of Civil
Procedure directs that "leave shall be freely given when justice
so requires." Fed. R. Civ. P. 15(a)(2). The liberality of the
rule "gives effect to the federal policy in favor of resolving
cases in their merits instead of disposing of them on

technicalities." *Laber v. Harvey,* 438 F.3d 404, 426 (4th Cir. 2006) (citing *Conley v. Gibson,* 355 U.S. 41, 48 (1957)).  A district court may deny a motion to amend "when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile." *Lorenz v. Davis,* No. 1:07cv940, 2008 WL 2943306, at *7 (E.D. Va. July 30, 2008) (citations omitted).  "[M]otions to amend are committed 'to the discretion of the trial court.'" *Id.* (citation omitted).

Upon consideration of the interests of justice in this case, the Court will permit Plaintiffs to file a second and final amended complaint.  This case is at an early stage in the litigation and granting leave to amend will not unduly delay this matter or prejudice Defendant.  Moreover, GLS has not submitted a compelling argument that amendment would be futile. The Court, therefore, yields to Rule 15(a)'s liberal standard and finds good cause to grant Plaintiffs leave to amend.  *See, e.g., Anchor Point Ventures, LLC. v. Harvel Corp.,* No. 3:07CV077-HEH, 2007 WL 1228060, at *2 (E.D. Va. Apr. 25, 2007). Plaintiffs shall submit their amended pleading within 10 days of this decision.

## C. GLS's Motion to Strike

In its second motion, GLS asks the Court to strike Plaintiffs' jury demand "[b]ecause Plaintiffs knowingly and

voluntarily agreed to waive their right to a trial by jury" in their employment contracts.  (Mot. to Strike Mem. [Dkt. 82] at 1.)  The Court will defer ruling on this motion in light of its decision to grant Plaintiffs leave to amend.  Should Plaintiffs amend their complaint to remove the jury demand this would moot the Motion to Strike; if not, GLS can renew its motion based upon the allegations contained in the amended pleading.

## IV. Conclusion

For the reasons set forth above, the Court will grant GLS's Motion to Dismiss as to Counts 2, 3, 4, 6, 7, 8, 9, 10, and 11 of the Amended Complaint.  The Court will further grant Plaintiffs' request to amend and defer ruling on GLS's Motion to Strike Jury Demand.  An appropriate order will follow.


|  | /s/ |
|---|---|
| July 8, 2014 | James C. Cacheris |
| Alexandria, Virginia | UNITED STATES DISTRICT COURT JUDGE |