IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

ALFRED ZAKLIT, *et al.,*            )
                                    )
        Plaintiffs,                 )
                                    )
            v.                      )    1:14cv314 (JCC/JFA)
                                    )
GLOBAL LINGUIST SOLUTIONS,          )
LLC, *et al.,*                      )
                                    )
        Defendants.                 )

**M E M O R A N D U M   O P I N I O N**

This matter is before the Court on Defendant Global Linguist Solutions, LLC's ("Defendant" or "GLS") Motion to Dismiss the Second Amended Complaint [Dkt. 113] and Motion to Strike Plaintiffs' Jury Demand [Dkt. 115].  For the following reasons, the Court will grant in part and deny in part Defendant's Motion to Dismiss the Second Amended Complaint and will grant Defendant's Motion to Strike Plaintiffs' Jury Demand.

**I.  Background**

**A. Factual History**

A detailed summary of the facts of this case is set forth in this Court's July 8 Memorandum Opinion granting in part and denying in part Defendant's Motion to Dismiss the Amended Complaint [Dkt. 100].  Briefly, Defendant provides translation and interpretation services to the United States Army.  (Second

1

Am. Compl. [Dkt. 102] ¶¶ 11-12).  Plaintiffs are linguists who either currently work or have worked for Defendant in Kuwait. (*Id.* ¶¶ 2-4, 11-12.)  Plaintiffs were deployed to Kuwait in mid-2012 to work on U.S. Army bases, initially under contract with one of Defendant's subcontractors, Engility.  (*Id.* ¶¶ 14, 22.)[1] Plaintiffs allege that immediately upon arrival in Kuwait, Defendant "took their passports" to obtain work visas from its Kuwaiti sponsor, Al Shora International General Trading & Contracting ("Al Shora").  (*Id.* ¶ 16.)  Furthermore, Plaintiffs allege that Defendant "prohibited Plaintiffs from working or leaving the [Army bases] for medical appointments, personal time, or even emergency matters."  (*Id.* ¶ 19.)  According to Plaintiffs, "[t]hey were told by GLS that they would be arrested, imprisoned, and/or deported by the Kuwaiti government if they left the camp."  (*Id.*)  Conditions in the camp were "abominable" and "substandard."  (*Id.* ¶ 20.)  "Forty Linguists were assigned to live in one 3,000-square-feet tent with limited air condition, running water and electricity."  (*Id.*)

When Defendant was awarded a new contract with the U.S. Army, it changed two key contractual relationships.  First, in early December 2012 it sought to terminate its local sponsorship agreement with Al Shora, leading to a dispute

---

[1] This Court granted Defendant's Motion for Judicial Notice of the Engility contracts.  (July 8 Mem. Op. at 2 n.2.)  Though Plaintiffs claim they worked for Defendant prior to their arrival in Kuwait in 2012, the Engility contracts plainly provide otherwise.  *See id.*

between the two companies over whether such termination was effective. *(Id.* ¶ 28.)  Second, it contracted directly with Plaintiffs in late January 2013.  *(Id.* ¶ 28.)

Plaintiffs' case revolves around these changes. First, Plaintiffs allege they were not aware that Defendant and Al Shora were involved in a contract dispute.  *(Id.* ¶ 28(f).) According to Plaintiffs, when they signed Defendant's 2013 employment contracts "GLS's employment of Plaintiffs in Kuwait was unlawful since GLS was unable to obtain Al Shora's agreement to continue sponsoring Plaintiffs for GLS or to transfer their sponsorship to another Kuwaiti entity."  *(Id.* ¶ 28(d).)  This lack of sponsorship was material and Plaintiffs contend they would not have signed the employment contracts had they known their sponsorship was in doubt.  *(Id.* ¶ 28(g).)

Second, Plaintiffs allege that Defendant "forced Plaintiff to sign new form employment contracts directly with GLS under [the abovementioned] horrid conditions."  *(Id.* ¶ 22.) Plaintiffs claim that the new contracts removed many benefits from their prior contracts with Engility.  *(Id.* ¶ 23.) According to Plaintiffs, Defendant "expressly told" them to "sign the form without reading anything."  *(Id.* ¶ 24.) Plaintiffs "did not believe the form was a contract because they had no opportunity to negotiate the terms of the agreement [nor were] given a choice not to sign it."  *(Id.* ¶ 25.)

Additionally, Defendant "never suggested to them that they should discuss the terms with a lawyer." (*Id.* ¶ 25.) Plaintiffs felt "they had no choice but to sign the form because GLS threatened to kick them off the base, [subjecting] them to immediate arrest and detention by Kuwaiti official [sic] if they did not sign the form." (*Id.* ¶ 26.)  At the time they signed the contracts, Plaintiffs "were under GLS's total control and domination because [GLS] held their passports." (*Id.* ¶ 27.) Plaintiffs were also "ill from the abominable living conditions[.]" (*Id.*)  "So [Plaintiffs] reluctantly signed the form without assenting to its terms." (*Id.* ¶ 27.)

**B. 2013 Contract with Defendant**

As noted above, Plaintiffs signed new employment contracts directly with Defendant.  These contracts are uniform and contain a "Governing Law" section.  This section, first found in Section 18 of the contract, contains a jury waiver provision.[2]  (*See* Def.'s Mot. to Dismiss Mem. [Dkt. 114], Phillips Decl., Ex. 1.)  It states "[b]oth parties hereby agree and consent to waive the right to a trial by jury." (*Id.* at 8.)[3]

Section 9 of Attachment A to the contract provides as follows: "This Agreement shall be governed by and interpreted under the laws of the Commonwealth of Virginia of the United

---

[2] The Court may consider Plaintiffs' 2013 employment contracts with Defendant because the Second Amended Complaint incorporates them by reference.  *See Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).
[3] Pagination of the contracts is CM/ECF pagination.

States of America." (*Id.* at 11.) Section 18 contains a cross-reference to the Governing Law provision in Attachment A. (*Id.* at 8.)

In addition to this section, the contracts make clear that Plaintiffs are at-will employees. The contracts specifically state that GLS has the right "at its sole discretion" to terminate its employment relationship with Plaintiffs "without cause at any time" and that Plaintiffs likewise "may voluntarily terminate this Agreement at any time." (*Id.*) Additionally, Defendant will "provide return transportation from the Employee's work location to the IRDO [Individual Replacement Deployment Operations] for theater outprocessing if this Agreement is terminated," (*id.* at 8), but cautioned that "[t]ravel could be significantly restricted, delayed or made more difficult by operational requirements of the military or by restrictions imposed by civil authorities[.]" (*Id.* at 4.) The contracts also provide that "this assignment carries the risk of bodily harm/death," and "[l]iving conditions at the assignment location could be remote and uncomfortable." (*Id.*)

The contracts outline employee benefits. Under the contracts, the positions are salaried. (*Id.* at 4.) The standard work schedule is set at twelve hours a day, six days per week, which could be more or less at the Defendant's

discretion.  (*Id.* at 11.)  Per the terms of the contract,
employees are not entitled to any overtime pay.  (*Id.* at 2.)
Nor are employees entitled to salary for "any time not worked by
reason of illness, injury, disability, or any other medical
reason."  (*Id.* at 5.)  Paid time off ("PTO") accrues on a
biweekly basis, with five days of PTO for twelve months of
service based on a twelve hour work day and a six day work week.
(*Id.* at 11.)

### C. Procedural History

In the July 8 Memorandum Opinion, this Court granted
in part and denied in part Defendant's Motion to Dismiss the
Amended Complaint.  As a threshold matter, the Court rejected
Plaintiffs' arguments that Kuwaiti law applied.  Instead, giving
full force to the choice-of-law provision contained in the
employment contracts, Virginia law applied to the case.  (July 8
Mem. Op. at 21-30.)  Nine of the eleven causes of action were
dismissed; only the false imprisonment and fraud claims
survived.  (*Id.* at 53.)  The Court granted Plaintiffs' leave to
file a second amended complaint and reserved ruling on the
motion to strike until the Second Amended Complaint was filed.
(*Id.*)

In the Second Amended Complaint now before the Court,
Plaintiffs allege eight causes of action: false imprisonment
("Count 1"); intentional infliction of emotional distress

("Count 2"); negligent infliction of emotional distress ("Count 3"); fraud ("Count 4"); rescission ("Count 5"); promissory fraud ("Count 6"); breach of contract ("Count 7"); and violation of Kuwaiti labor law ("Count 8").

Defendant has moved to dismiss the Second Amended Complaint in its entirety and strike Plaintiffs' jury demand. Having been fully briefed and argued, Defendant's motions are now before the Court.

## II.  Standard of Review

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint[.]" *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citation omitted). The Supreme Court has stated that in order "[t]o survive a motion to dismiss, a [c]omplaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The issue in resolving such a motion is not whether the non-movant will ultimately prevail, but whether the non-movant is entitled to offer evidence to support his or her claims.

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (citations omitted). While legal conclusions can provide the framework for a complaint, all claims must be supported by factual allegations. *Id.* Based upon these allegations, the court will determine whether the plaintiff's pleadings plausibly give rise to an entitlement to relief. *Id.* To survive a motion to dismiss, a plaintiff's complaint must demand more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555. Legal conclusions couched as factual allegations are not sufficient. *Twombly*, 550 U.S. at 555. Hence, a pleading that offers only "formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 557. Nor will a complaint that tenders mere "naked assertion[s]" devoid of "further factual enhancement." *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 557.

Moreover, the plaintiff does not have to show a likelihood of success on the merits. Rather, the complaint must merely allege - directly or indirectly - each element of a "viable legal theory." *Twombly*, 550 U.S. at 562-63. At the motion to dismiss stage, the court must construe the complaint

in the light most favorable to the plaintiff, read the complaint
as a whole, and take the facts asserted therein as true. *Iqbal*,
556 U.S. at 678.

### III.   Analysis

#### A. Choice of Law

In their memorandum opposing the motion to dismiss,
Plaintiffs contend that their complaint raises new factual
allegations that the choice-of-law provision was procured as a
result of unequal bargaining power between the parties.  At the
hearing, Plaintiffs' counsel changed course and stated that they
were not again challenging the choice-of-law provision.  Even if
this point were not conceded, however, the choice-of-law
provision would be enforceable.  First, Plaintiffs' general
allegations about the circumstances surrounding the signing of
the employment contracts are not enough to invalidate the
choice-of-law provision.  For the purposes of determining the
enforceability of a choice-of-law provision, such general
allegations are irrelevant.  The disparity in bargaining power
must have specifically resulted in the inclusion of the
provision, and there is no evidence that happened here. *See*
*Faltings v. Int'l Bus. Machs. Corp.*, No. 87-1123, 1988 WL 83316,
at *3 (4th Cir. Aug. 4, 1988) (stating under Virginia law,
choice-of-law provision is to be given effect unless "there was
no reasonable basis for the parties' choice or where one of the

9

parties was misled into agreeing to the *provision*.") (emphasis
added) (citations omitted); *Middleburg Training Center, Inc. v.
Firestone*, 477 F. Supp. 2d 719, 726 (E.D. Va. 2007) (enforcing
forum-selection clause because it did not appear that the
"forum-selection *provision* at issue here was imposed by fraud or
unequal bargaining power or was otherwise unreasonable.")
(emphasis added); *Ash-Will Farms, L.L.C. v. Leachman Cattle Co.*,
Nos. (Chancery) 02-195, (Chancery) 02-200, 2003 WL 22330103, at
2 (Va. Cir. Ct. Feb. 13, 2003) ("Absent a showing that the
contract forum selection *clause* is unreasonable or *was imposed
by fraud or unequal bargaining power*, the parties' choice should
be enforced.") (emphasis added).[4]

     Second, Plaintiffs seek to portray themselves as
powerless against GLS, arguing that the employment contracts are
adhesion contracts.  Plaintiffs' argument is unpersuasive.
Under Virginia law, an adhesion contract is defined as a
"standard form contract, prepared by one party and presented to
a weaker party – usually a consumer – who has no bargaining
power and little or no choice about the terms."  *Senture, LLC v.
Dietrich,* 575 F. Supp. 2d 724, 727 n.1 (E.D. Va. 2008) (citation
omitted) (internal quotation marks omitted). Plaintiffs'
assertion that the inherent inequality in an employer-employee

---

[4] As other jurisdictions have noted, there is little difference between
arbitration, forum-selection, and choice-of-law clauses for enforceability
purposes.  *Haynsworth v. The Corp.*, 121 F.3d 956, 963 (5th Cir. 1997).

relationship automatically renders the employment agreements
contracts of adhesion must be rejected.  Simply because an
employer and an employee do not stand on equal footing with
respect to bargaining power does not magically transform an
employment agreement into an adhesion contract.  *See Torres v.
SOH Distribution Co.*, No. 3:10C-CV-179, 2010 WL 1959248, at *3
(E.D. Va. May 13, 2010) ("Absent evidence of a bad-faith motive,
disparity in bargaining power does not render a forum selection
clause fundamentally unfair.")  Rather, the test for determining
whether an employment agreement is an adhesion contract is
whether "an employee has the freedom to consider employment
elsewhere and is not bound to continue working for his current
employer." *Senture*, 575 F. Supp. 2d at 727 n.1 (citing *Schwam
v. XO Commc'ns., Inc.*, No. 05-1060, 2006 WL 6884392, at *2 (4th
Cir. Mar. 24, 2006)).  If the employee has such freedom, an
employment agreement will not be considered an adhesion
contract. *Id.*

        In this case, Plaintiffs had the ability to terminate
the contract for any reason and to choose other employment.
Under Section 16(a) of the contract, "the employee may
voluntarily terminate this agreement at any time by providing a
fifteen day written notice to the Employer." (Phillips Decl.,
Ex. 1 at 8.)  Furthermore, if either party terminated the
contract, Defendant was responsible for providing return

transportation to the Individual Replacement Deployment Operations ("IRDO") for out-processing.  (Phillips Decl., Ex. 1 at 8.)

With respect to arguments about the choice-of-law provision already raised and decided, Plaintiffs have not alleged any additional facts that would change this Court's prior analysis as set forth in the July 8 Memorandum Opinion. Under the law of the case doctrine, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *TFWS, Inc. v. Franchot*, 572 F.3d 186, 191 (4th Cir. 2009) (citations omitted) (internal quotation marks omitted).  There are three exceptions to this rule: "(1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to the issue, or (3) the prior decision was clearly erroneous and would work manifest injustice."  *Id.* at 191.

Plaintiffs have not argued that any of the exceptions should apply in this case.  Regardless, none of the exceptions are applicable.  The only plausible exception here is the third. To succeed, the challenging party has a "high burden" to show the prior decision was wrong.  *TFWS*, 572 F.3d at 193.  "A prior decision does not qualify for this third exception by being just maybe or probably wrong; it must . . . strike us as wrong with

the force of a five-week-old, unrefrigerated dead fish." *Id.*
(citation omitted) (internal quotation marks omitted).  Thus, it
must be "dead wrong." *Id.* (citation omitted) (internal
quotation marks omitted).  Plaintiffs have made no showing that
this Court's decision is "dead wrong."  Thus, this Court finds
its prior examination of the scope of the choice-of-law
provision more than sufficient to dispose of this issue here.
Therefore, Virginia law will apply to all of Plaintiffs' claims.

### B. GLS's Motion to Dismiss

Having determined what law to apply, the Court will
turn to GLS's Motion to Dismiss.  Each of Plaintiffs' claims is
addressed in turn below.

### Count 1 – False Imprisonment

Under Virginia law, false imprisonment is defined as
the restraint of a person's liberty without sufficient cause.
*Zayre of Va., Inc. v. Gowdy,* 147 S.E.2d 710, 713 (Va. 1966).
"If a person is under a reasonable apprehension that force will
be used unless he willingly submits, and he does submit to the
extent that he is denied freedom of action, this, in legal
contemplation, constitutes false imprisonment." *Id.*  "To
maintain an action for false imprisonment it is not necessary to
show malice, ill will or the slightest wrongful intention, and
neither the good faith of a defendant nor that of his employee
will defeat a plaintiff's right to recover." *Id.*

13

Here, Plaintiffs allege that Defendant "acted with the intention of confining Plaintiffs within fixed boundaries." (Second Am. Compl. ¶ 63.)  "By physical barriers and by means of unreasonable duress," Defendant restrained Plaintiffs' freedom of movement "by barring Plaintiffs and Class members [sic] from leaving the Army bases for any reason, including medical appointments, personal time and emergency matters." (*Id.* ¶ 64.) In addition, Plaintiffs allege that "[u]pon immediate arrival, GLS took their passports from them." (*Id.* ¶ 16.)  Plaintiffs contend Defendant had no legal justification in preventing them from leaving the base.  (*Id.* ¶ 63.)

Accepting these allegations as true and construing all inferences in Plaintiffs' favor, the Court is compelled to find that the Second Amended Complaint, although scant, sufficiently states a claim for false imprisonment against Defendant. *See Trull v. Smolka,* No. 3:08CV460-HEH, 2008 WL 4279599, at *7 (E.D. Va. Sept. 18, 2008) (finding claim of false imprisonment sufficiently pled where plaintiff alleged "[d]efendants required him to exit his home and ride to the hospital in an ambulance" and "he was afraid to disregard the [d]efendants' words, acts and/or threats.").

Defendant renews its previous grounds for dismissal of the false imprisonment claim.  (Def.'s Mot. to Dismiss Mem. at

20.)  As before, the Court finds those arguments unpersuasive.
(*See* July 8 Mem. Op. at 31-32.)

Because Plaintiffs have stated a sufficiently
plausible claim of false imprisonment to survive dismissal under
Rule 12(b)(6), the Court will deny Defendant's motion as to
Count 1.

### Count 2 – Intentional Infliction of Emotional Distress

To succeed on a claim of intentional infliction of
emotional distress in Virginia, the plaintiff must show "(1) the
wrongdoer's conduct was intentional or reckless; (2) that his
conduct was outrageous and intolerable, offending the generally
accepted standards of decency and morality; (3) that there is a
causal connection between the conduct and the emotional
distress; and (4) that the resulting emotional distress was
severe."  *Ortiz v. Panera Bread Co.,* No. 1:10CV1424, 2011 WL
3353432, at *6 (E.D. Va. Aug. 2, 2011) (citing *Womack v.
Eldridge,* 210 S.E.2d 145, 148 (Va. 1974)).  Intentional
infliction of emotional distress claims are rarely successful.
*Michael v. Sentara Health Sys.,* 939 F. Supp. 1220, 1233 (E.D.
Va. 1996) ("Because injury to the mind or emotions can be easily
feigned, actions for intentional infliction of emotional
distress are not favored in Virginia.")  "The burden of proof
for this claim is high and not often met, as the plaintiff must
prove his or her case by clear and convincing evidence."  *Ortiz,*

2011 WL 3353432, at *6 (citing *Ruth v. Fletcher*, 377 S.E.2d 412, 416 (Va. 1989)).

Plaintiffs have failed demonstrate that Defendant's conduct meets the second element of a claim for intentional infliction of emotional distress, namely, that Defendant's conduct was so outrageous and extreme that it offends all notions of decency. When evaluating a claim for intentional infliction of emotional distress, "[i]t is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery[.]" *Womack,* 210 S.E.2d at 148. A plaintiff must allege conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Russo v. White,* 400 S.E.2d 160, 163 (Va. 1991) (citation omitted) (internal quotation marks omitted). This element "cannot be satisfied by [merely] alleging that the defendant's behavior was tortuous, or even criminal." *Ortiz,* WL 3353432, at *6.

Plaintiffs have not shown that Defendant's conduct meets this exacting standard. On the one hand, they contend that Defendant's alleged false imprisonment was so extreme and outrageous as to satisfy this element. (Second Am. Compl. ¶ 68.) In the next paragraph, however, they state that Defendant

16

told them they were in danger of being "arrested, imprisoned, and/or deported by the Kuwaiti government if they left the base." (*Id.* ¶ 69.)  In light of the latter admission, no reasonable fact finder could find Defendant's behavior extreme or outrageous.

Plaintiffs further allege that Defendant's failure to inform them that they were not legally entitled to work in Kuwait was extreme and outrageous conduct.  (*Id.* ¶ 69.) Plaintiffs' argument is without merit.  Even accepting as true these allegations, such an omission by Defendant is not "atrocious and utterly intolerable in a civilized society." Furthermore, Plaintiffs have not shown a causal connection between the failure to inform and their emotional distress. Presumably, the uncertainty surrounding their legal status would be most distressful during their time in Kuwait.  However, Plaintiffs were not made aware of their legal status until July 2013.  (Second Am. Compl. ¶ 28.)  If Plaintiffs were unaware of their legal status, it is difficult to imagine how they could be distressed during the time between signing the employment agreements in January 2013 until when they discovered their legal jeopardy in July 2013.  (*See id.* ¶¶ 69-71.)

Even assuming, without deciding, that a reasonable jury could find in Plaintiffs' favor for the first three elements, Plaintiffs' claim must fail because they have not

17

shown they suffered the emotional distress required to meet the final element.  To satisfy this element, a plaintiff must show that "the distress inflicted is so severe that no reasonable person could be expected to endure it."  *Russo*, 400 S.E.2d at 163.

Plaintiffs contend that the "horrid living conditions" arising from their false imprisonment caused them to get "very sick." (Second Am. Compl. ¶ 71.)  Specifically, Plaintiffs state they had a "variety of physical illnesses, ranging from pneumonia to fevers to various infections, including eye and ear infections." (*Id.*)  These allegations do not rise to the level of severe distress that no reasonable person could endure.  *See Russo*, 400 S.E.2d at 161-63 (finding that plaintiff's nervousness, sleeplessness, stress and its physical symptoms, withdrawal from normal activities, and lack of concentration at work did not rise to the level of severe emotional distress); *see Molina v. Summer Consultants, Inc.*, LAW No. 152715, 1996 WL 1065653, at *3 (Va. Cir. Ct. Dec. 9, 1996) (finding plaintiff's allegations that she suffered shock, panic attacks, lost sleep, lost income, humiliation, stress, pain, suffering, medical expense, physical impact, and other injury as a result of her employer's alleged continued sexual harassment did not rise to the level of severe emotional distress).

Plaintiffs also allege that they suffered "severe emotional distress and anxiety" as a result of "being declared fugitives in a foreign country." (Second Am. Compl. ¶ 72). This caused Plaintiffs "to suffer additional illnesses and physical injuries, pain and suffering, inconvenience, medical expenses, future medical expenses, and other damages." (*Id.*) These allegations do not rise to the level of distress required to satisfy the final element of a claim for intentional infliction of emotional distress. Accordingly, the Court will grant Defendant's motion as to this count.

### Count 3 – Negligent Infliction of Emotional Distress

"The standard for negligent infliction of emotional distress is even more rigorous than the standard for intentional infliction of emotional distress." *Michael*, 939 F. Supp. at 1234. To survive a motion to dismiss on a claim for negligent infliction of emotional distress without physical impact, as is the case here, a plaintiff must plead "that his physical injury was the natural result of fright or shock proximately caused by the defendant's negligence." *Hughes v. Moore,* 197 S.E.2d 214, 219 (Va. 1973); *see Myseros v. Sissler,* 387 S.E.2d 463, 465-66 (Va. 1990). In other words, to state a claim for relief, a plaintiff must show "a clear and unbroken chain of causal connection between the negligent act, the emotional disturbance, and the physical injury." *Hughes*, 197 S.E.2d at 220.

19

As an initial matter, "there can be no actionable negligence unless there is a legal duty, violation of the duty, and a consequent injury." *Gray v. INOVA Health Care Servs.*, 514 S.E.2d 355, 356 (Va. 1999) (citation omitted) (internal quotation marks omitted).  Plaintiffs maintain that Defendant "breached its duty to exercise reasonable care and acted negligent and carelessly in, among others, the selection of their sponsors, and in failing to train their employees and/or agents in Kuwaiti immigration laws." (Second Am. Compl. ¶ 76.) Plaintiffs argue that, in violation of Kuwaiti law, Defendant was negligent in failing to transfer sponsorship before the termination of the Al Shora contract in December 2012.  (*Id.* ¶ 33.)

To the extent Plaintiffs' negligence theory rests on negligent hiring of Al Shora, this Court previously held that the Defense Base Act bars such a theory of liability.  (July 8 Mem. Op. at 34.)  Assuming, without deciding, that Defendant had a legal duty under Kuwaiti law to maintain local sponsorship and negligently failed to do so, Plaintiffs' claim fails because they have not alleged that their emotional disturbance caused physical injury.  First, it is not clear that the physical injury is a manifestation of their emotional disturbance. Plaintiffs argue that "[t]heir physical injuries caused by their emotional distress ranged from pneumonia to fevers to various

20

infections, including eye and ear infections." (Second Am.
Compl. 79.)  But elsewhere in the Second Amended Complaint,
Plaintiffs attribute their sickness to the "horrid and stressful
living conditions," rather than their emotional distress.  (*Id.*
¶ 21) ("Given the horrid and stressful living conditions,
Plaintiffs got very sick.  Their sickness ranged from pneumonia
to fevers to various infections, including eye and ear
infections.")  Even generously construing Plaintiffs'
inconsistencies in their favor, causation still cannot be
satisfied.  By their own admission, Plaintiffs were unaware of
their change in legal status until July 2013.  (*Id.* ¶ 28.)  Yet
they allege they were confined to the base from early 2013.
(*Id.* ¶ 16.)  Any injuries they suffered from such confinement
could not have been caused by emotional distress from
Defendant's negligence in failing to find a new sponsor because
Plaintiffs were completely unaware that they were sponsorless.

Plaintiffs have not alleged that their emotional
distress caused their physical injuries, which defeats their
claim for negligent infliction of emotional distress.
Therefore, Defendant's motion as to Count 3 will be granted.

### Count 4 – Fraud

"Under Virginia law, a claim of fraud requires six
elements: '(1) a false representation, (2) of a material fact,
(3) made intentionally and knowingly, (4) with intent to

21

mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled.'" *Lamberty v. Premier Millwork & Lumber Co., Inc.*, 329 F. Supp. 2d 737, 743 (E.D. Va. 2004) (quoting *Prospect Dev. Co. v. Bershader*, 515 S.E.2d 291, 297 (Va. 1999)).  Concealment of a material fact may support a fraud claim under Virginia law only if a party makes a "knowing and deliberate decision not to disclose a material fact," and the concealing party "knows that the other party is acting upon the assumption that the fact does not exist." *Girgis v. Salient Solutions, Inc.,* No. 1:11-CV-1287, 2012 WL 2792157, at *15 (E.D. Va. July 9, 2012).

    "In alleging fraud . . . a party must state with particularity the circumstances constituting fraud or mistake, but intent and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).  At minimum, a plaintiff alleging fraud must describe "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *U.S. ex rel. Wilson v. Kellog Brown & Root, Inc.,* 525 F.3d 370, 379 (4th Cir. 2008) (citation omitted).  "When the fraud alleged is based on an omission of material fact, Rule 9(b) requires that plaintiffs plead the type of facts omitted, the place in which the omission should have appeared, and the way in which the omitted facts made the defendant's affirmative

representations misleading." *Morris v. Wachovia Sec., Inc.,* 277 F. Supp. 2d 622, 645 (E.D. Va. 2003).  "In assessing whether a plaintiff has satisfied the requirements of Rule 9(b), courts must be mindful that the principle purpose behind the rule is to prevent strike suits.  Thus, while mere incantation of the word 'fraud' is clearly insufficient, Rule 9(b) does not require a dissertation." *Id.* (citations omitted).

Here, Plaintiffs allege Defendant purposefully concealed the lack of a sponsorship agreement with a local company as required under Kuwaiti law.  Plaintiffs alleged that "GLS did not obtain the transfer of Plaintiffs' Kuwaiti sponsorship for Al Shora as required prior to the termination of the Al Shora contract on December 5, 2012."  (Second Am. Compl. ¶ 33.)  Plaintiffs specifically allege:

- At the time GLS had Plaintiffs sign the 2013 Contract, GLS's sponsorship contract with Al Shora had expired, but Plaintiffs [sic] sponsorship had not been transferred from Al Shora to another Kuwaiti sponsor.

  [. . . ]

- At the time GLS had Plaintiffs sign the 2013 Contract, GLS's employment of Plaintiffs in Kuwait was unlawful since GLS was unable to obtain Al Shora's agreement to continue sponsoring Plaintiffs for GLS or to transfer their sponsorship to another Kuwaiti entity.

- GLS concealed the lack of Kuwaiti sponsorship for Plaintiffs' employment from Plaintiffs at all times prior to Plaintiffs' execution of the 2013 Contract.

- At the time Plaintiffs were induced to enter into the 2013 Contract they were ignorant of the fact that GLS did not

have [sic] required Kuwaiti sponsorship lined up for
Plaintiffs.

- The lack of Kuwaiti sponsorship was material and
  Plaintiffs would not have signed or entered into the 2013
  Contract had they been aware that GLS did not have a
  sponsorship agreement with a Kuwaiti entity that would
  cover Plaintiffs' employment under the 2013 Contract.

- GLS knew that Plaintiffs assumed their employment pursuant
  to the 2013 Contracts would be lawful under Kuwaiti law,
  including that they would be properly sponsored by a
  Kuwaiti entity.

  [. . . ]

- Subsequent to when Plaintiffs and GLS entered into the
  2013 Contract, Al Shora turned over the names of GLS's
  employees (including Plaintiffs) to Kuwaiti immigration
  authorities, declared them absent from work, and in
  violation of their working visas.  Consequently Plaintiffs
  and other Linguists' work visas were cancelled, and they
  were placed on Kuwaiti's [sic] "blacklist" for arrest
  and/or deportation.

  [. . . ]

- In short GLS's actions and legal dispute with Al Shora
  made Plaintiffs and other Linguists fugitives in a foreign
  country.  GLS used Plaintiffs – its own employees – as
  pawns in its monetary dispute with Al Shora.

(*Id.* ¶ 28(a) – 28(h), (k)-(m).)  Plaintiffs have thus alleged

that Defendant intentionally and knowingly failed to disclose a

material fact to induce Plaintiffs to sign employment contracts

they would have otherwise not signed.  This was done, according

to Plaintiffs, so that Defendant could continue profiting from

Plaintiffs' translation services.  The Court finds these

allegations sufficient to state a claim for fraud under both

24

state substantive law and federal pleading standards.  *See*

*Lamberty*, 329 F. Supp. 2d at 744.

Defendant renews its previous arguments in support of

dismissal of the fraud claim.  (Def.'s Mot. to Dismiss Mem. at

20.)  As before, the Court finds those arguments unpersuasive.

(*See* July 8 Mem. Op. at 44.)  Accordingly, Defendant's motion to

dismiss the fraud claim is denied.

### Count Five – Rescission

In this count, Plaintiffs seek rescission of the

employment contracts on grounds of "fraud, overreaching, undue

influence, and/or unconscionability."[5]  (Second Am. Compl. ¶

104); *see Gregory v. FedEx Ground Package System, Inc.*, No.

2:10cv630, 2012 WL 2396873, at *5 (E.D. Va. May 9, 2012), *report

and recommendation adopted*, 2012 WL 2396861 (E.D. Va. June 25,

2012) (considering plaintiffs' claim for rescission of an

employment contract on grounds that it is void against public

policy and an unconscionable adhesion contract).  A party

seeking rescission of a contract has a high burden, as

rescission is "a remedy which calls for the highest and most

drastic power of a court of chancery - to annul and set at

naught the solemn contracts of parties." *Schmidt v. Household

Finance Corp., II*, 661 S.E.2d 834, 837 (Va. 2008) (citation

---

[5] The Court assumes Plaintiffs have pled this in the alternative to their
breach of contract claim.  *See* Fed. R. Civ. P. 8(e) ("Pleadings must be
construed so as to do justice.").

omitted) (internal quotation marks omitted).  "There must first be a sufficient averment of facts showing the plaintiff entitled in equity to the relief which he seeks, and satisfactory proof of these facts, to justify the interposition of the court."  *Id.* In addition to sufficient factual allegations, the plaintiff must show that the court can substantially restore the parties to the position they occupied before they entered into the contract.  *Id.* at 837; *see also McLesky v. Ocean Park Investors, Ltd.*, 405 S.E.2d 846, 847 (Va. 1991) ("If rescission is to be granted, the contract is terminated for all purposes, and the parties are restored to the *status quo ante*.").

        As noted earlier, the contracts at issue here are not adhesion contracts, as Plaintiffs could terminate their contracts for any reason and return to the United States to seek other employment.  However, Plaintiffs have made out a colorable fraud claim in the procurement of the employment contracts. Therefore, the question remains whether this Court could substantially unwind the transaction through the remedy of rescission.  Defendant correctly notes that rescission requires both parties to "disgorge the fruits of the bargain." (Def.'s Mot. to Dismiss Mem. at 15.)  This means Defendant would be required to disgorge Plaintiffs' services (or the value thereof) and Plaintiffs would be required to disgorge their earnings. Plaintiffs have not addressed their obligations if the contract

was rescinded.  Though obviously impossible to restore these
parties to their pre-employment contract position, Virginia
courts recognize that literal restoration is not required.
"[B]ut where, on account of the act of the adverse party,
complete restitution cannot be had, rescission will not be
denied, and the court will, so far as practicable, require the
party profiting by the fraud to surrender the benefit he has
received in the transaction." *Millboro Lumber Co. v. August
Wood Products Corp.*, 125 S.E. 306, 310 (Va. 1924).  In *Millboro*,
the Virginia Supreme Court upheld an award of damages to a
plaintiff seeking rescission.  Applying *Millboro* in considering
a motion to dismiss, another court in this district found that
restoring parties to the positions they enjoyed prior to
entering into an employment contract could be accomplished
through offsetting damages.  *Gregory*, 2012 WL 2396873, at *6;
*see Saunders v. General Services Corp.*, 659 F. Supp. 1042, 1057
(E.D. Va. 1987) (holding restoration could be accomplished by
offsetting amount plaintiff received in consideration for the
contract from any damages award it received).  In allowing the
claim to go forward, the *Gregory* court found restoration (and
thus rescission) was feasible.  But it reserved deciding whether
rescission was in fact the best remedy until after all the facts
were in evidence.  *Gregory*, 2012 WL 2396873, at *7 ("Although
rescission may not be an appropriate remedy upon further

27

examination of the facts, it appears from the allegations [in

the complaint] that the Court could achieve equitable

restoration by offsetting the benefits Plaintiffs gained under

the [employment contract] against any amounts owed to them as a

consequence of being misclassified as independent contractors.")

Here, the Second Amended Complaint provides no

guidance as to whether determining the value of Plaintiffs'

interpretation services to the Defendant would be feasible.  And

it is not for this Court to speculate as to whether such

valuation is, in fact, practicable.  Since Plaintiffs have not

moved this claim from the conceivable to the plausible,

Defendant's motion to dismiss as to this claim will be granted.

### Count Six – Promissory Fraud

"'Because fraud must involve a misrepresentation of a

present or a pre-existing fact, fraud ordinarily cannot be

predicated on unfulfilled promises or statements regarding

future events.'"  *Girgis,* 2012 WL 2792157, at *12 (quoting

*Supervalu, Inc. v. Johnson,* 666 S.E.2d 335, 342 (Va. 2008)).

But "if a defendant makes a promise that, when made, he has no

intention of performing, that promise is considered a

misrepresentation of present fact and may form the basis for a

claim of actual fraud."  *Supervalu, Inc.,* 666 S.E.2d at 342.  To

satisfy the pleading standard for fraud under such a theory, a

plaintiff must clearly allege a contemporaneous intent not to

perform at the time a fraudulent statement is made.  *See Station # 2, LLC v. Lynch,* 695 S.E.2d 537, 540 (2010).

In their Second Amended Complaint, Plaintiffs raise one new allegation.  Plaintiffs argue that Defendant "knew that Plaintiffs would not enter the 2013 Contract if [the lack of sponsorship] was disclosed." (Second Am. Compl. ¶ 110.)  This new allegation does nothing to change this Court's prior analysis of the promissory fraud claim.  (July 8 Mem. Op. 45-46.)  Therefore, Count 6 will be dismissed.

### Count Seven – Breach of Contract

In Virginia, the elements of a breach of contract action are "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Signature Flight Support Corp. v. Landow Aviation Ltd. Partnership*, No. 1:08cv955, 2009 WL 111603, *8 (E.D. Va. Jan. 14, 2009) (quoting *Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004)).  It is undisputed that a contract exists between the parties in this case, and, for purposes of this motion, Defendant does not contest the issue of damages. Accordingly, the only point of contention is whether Plaintiffs have sufficiently alleged breach.

Plaintiffs allege two breaches.  First, Plaintiffs contend "GLS, in material breach of the 2013 Contract, failed to

pay for Plaintiffs' transport back home.  Instead Plaintiffs
paid a minimum of $1,000.00 each, out of their own pockets, to
pay for their transport back to the United States." (Second Am.
Compl. ¶ 119)  Section 16(c) of the employment contract states
"Transportation Expenses – The Employer shall provide return
transportation from the Employee's work location to IRDO
[Individual Replacement Deployment Operations] for out-
processing if this Agreement is terminated."  (Phillips Decl.,
Ex. 1 at 8.)  The IRDO is in Indiana.  (Def.'s Mot. to Dismiss
Mem. at 18.)  Plaintiffs have not alleged any facts tending to
show Defendant failed to pay for transportation to the IRDO.
Furthermore, under the contract Defendant's only obligation is
to provide transportation to the IRDO.  After that has been met,
any additional travel inside the United States is Plaintiffs'
responsibility.  Therefore, Plaintiffs have failed to state a
claim for breach of contract for failing to provide
transportation.  To the extent that Plaintiffs are reasserting
Defendant has breached the contract because of delay in
providing return transportation, this Court considered and
rejected that theory of breach in the July 8 Memorandum Opinion.
(July 8 Mem. Op. at 46-47.)

Second, Plaintiffs allege Defendant failed to pay
Plaintiffs per diem rates and "other benefits promised to them."
(Second Am. Compl. ¶ 120.)  Section 3(f) of the contracts states

30

that for "TDY Travel" (temporary duty travel off-base) Plaintiffs "*may* be entitled to approved per diem rates." (Phillips Decl., Ex. 1 at 3) (emphasis added).  Plaintiffs have not alleged that they made any such TDY Travel.  Additionally, "may" indicates that per diem rate for such travel was not an automatic entitlement; thus, it is not clear that they would necessarily receive a per diem had they done any TDY Travel.  It is undisputed that the Engility contracts provided per diem benefits.  (Def.'s Mot. to Dismiss Mem. at 18.)  However, those contracts are not at issue here.

        As to "other benefits promised to them," Plaintiffs have failed to allege in any detail the benefits they are supposedly owed.  In their Opposition to Defendant's Motion to Dismiss, Plaintiffs assert that they have stated a claim for paid time off benefits ("PTO benefits") that may be owed to them.  (Pls.' Opp'n to Def.'s Mot. to Dismiss at 19.)  Section 4 of Attachment A of the contract provides that Plaintiffs "shall accrue on a biweekly basis, 5 days of PTO for 12 months of service based on a twelve (12) hour work day and a six (6) day work week."  (Phillips Decl., Ex. 1 at 11.)  But neither the Second Amended Complaint nor Plaintiffs' Opposition detail any

factual allegations to support their claim that they did not receive PTO benefits to which they were entitled.[6]

Accordingly, Plaintiffs have failed to allege a claim for breach of contract for failure to pay per diem and other benefits.  As both of Plaintiffs' grounds for breach of contract are insufficient as a matter of law, this Court will dismiss Count 7.

### Count Eight – Violation of Kuwaiti Labor Law

Lastly, Plaintiffs allege violations of Kuwaiti labor law regarding overtime, holiday, and vacation pay.  (Second Am. Compl. ¶¶ 125-28.)  Plaintiffs have not alleged any additional facts that would change this Court's analysis as set forth in the July 8 Memorandum Opinion.  Accordingly, this claim fails because, as noted above, the parties have validly contracted to refer to a different body of law – Virginia – to govern disputes concerning the terms and conditions of Plaintiffs' employment

---

[6] Defendant asserts that Plaintiffs cannot use their Opposition to re-plead allegations in the Second Amended Complaint.  (Def.'s Resp. to Pls.' Opp'n to Mot. to Dismiss [Dkt. 127] at 14-15.  In considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), courts may consider "documents attached to the complaint, as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic."  *Bala v. Commonwealth of Virginia Dept. of Conservation and Recreation*, 532 Fed. App'x. 332, 334 (4th Cir. 2013); *see Caner v. Autry*, __ F. Supp. 2d ___, 2014 WL 2002835, at *5 (W.D. Va. May 14, 2014) ("If I were to consider [Defendant's] Motion under Rule 12(b)(6), I would consider the material submitted with Plaintiff's response to the motion, as it is integral or incorporated into the Amended Complaint.").  Therefore, it is within this Court's discretion to consider arguments advanced in Plaintiffs' Opposition, as "they are integral to the complaint."

with Defendant.  Therefore, the Court will grant Defendant's motion as to Count 8.

### C. GLS's Motion to Strike Jury Demand

Defendant has moved to strike Plaintiffs' jury demand, arguing that Plaintiffs have knowingly and intelligently waived their right to jury trial in signing the employment contracts. Federal Rule of Civil Procedure 39(a)(2) states that when a trial by jury is demanded, the case must be docketed as a jury action and a trial on all issues so demanded must be by jury unless "the court, on motion or on its own, finds that on some or all of those issues there is no federal right to jury trial." Fed. R. Civ. P. 39(a)(2); *see Dunkin' Donuts Franchised Rests. LLC v. Manassas Donut Inc.*, 2008 WL 110474, at *2 (E.D. Va. Jan. 8, 2008).

Though the Seventh Amendment of the United States Constitution guarantees the right to a jury trial in civil cases, courts in this circuit have long recognized that parties to a contract may waive this right by prior written agreement. *See Leasing Serv. Corp. v. Crane*, 804 F.2d 828, 832 (4th Cir. 1986).  The party seeking enforcement of the waiver must show that consent to the waiver was both voluntary and informed. *Leasing Serv. Corp.*, 804 F.2d at 833.  "'Because the right to a jury trial is fundamental, [the] court should 'indulge every reasonable presumption against waiver.'" *Taylor v. Republic*

33

*Servs.*, No. 1:12cv00523-GBL-IDD, 2013 WL 8808090, at *2 (Apr. 16, 2013) (quoting *Aetna Ins. Co. v. Kennedy*, 301 U.S. 389, 393 (1937)).  In considering whether the waiver was voluntary, a court will consider "(1) the parties' negotiations concerning the waiver provision; (2) the conspicuousness of the provision in the contract; (3) the relative bargaining power of the parties; and (4) whether the waiving party's counsel had an opportunity to review the agreement." *Dunkin' Donuts*, 2008 WL 110474, at *2.

Applying these factors here, Plaintiffs have voluntarily and knowingly waived their right to jury trial.[7] First, Plaintiffs allege that they did not have an opportunity to negotiate the terms of the agreement.  While the fact that the parties here did not negotiate over the provision is relevant, it is certainly not dispositive. *See Bryant Elec. Co., Inc. v. City of Fredericksburg*, 762 F.2d 1192, 1197 (4th Cir. 1985) (upholding a forum selection clause in a contract entered into after competitive bidding process, where there was very little negotiation regarding its terms); *Torres v. SOH Distribution Co.*, 2010 WL 1959248, at *3 (stating, in a case brought by plaintiff-employee against defendant-employer, that

---

[7] The relevant provision states "[b]oth parties hereby agree and consent to waive the right to a trial by jury." (Phillips Decl., Ex. 1 at 8.)

"[a] mere lack of actual bargaining will not render a forum selection clause unenforceable.").[8]

Second, the placement of the jury waiver provision is conspicuous.  The paragraph is written in the same typeface and size as other provisions in the contract.  It appears on page eight of twelve under the heading "Governing Law."  The provision is written in unambiguous and clear language.  Though the provision is not bolded or italicized, the contract is short and is printed in easy-to-read typeface.  *See Leasing Servs. Corp.*, 804 F.2d at 833 (upholding jury waiver clause that was in a two-page standardized fine print contract provided by the plaintiff, where the waiver was in the nineteeth line of print in the middle of a thirty-eight line paragraph).  Plaintiffs initialed every page of the employment contracts, including the page with the jury trial waiver on it, acknowledging their review and acceptance of the terms of the contract.

Third, the relative bargaining power of the parties weighs in favor of upholding the clause.  Plaintiffs argue that "the very nature of the relationship of the Plaintiffs and GLS, as individual employees and large corporate employer, dictates that Plaintiffs were in a substantially weaker bargaining

---

[8] The letter transmitted with the Engility contract notified Plaintiffs that they had an opportunity to ask questions before signing the contracts. (Def.'s Mot. to Dismiss Am. Compl. [Dkt. 80], Lucas Decl., Ex. 1 at 4) ("If you would like clarification of any required disclosures or obligations please contact the undersigned before signing this offer.").

position than GLS." (Pls.' Opp'n to Def.'s Mot. to Strike [Dkt. 123] at 9.) But courts in this circuit have routinely upheld jury waiver and arbitration provisions in employment contracts between individual plaintiffs and corporate defendants. *Green v. Zachry Indus., Inc.*, No. 7:11CV00405, 2014 WL 1232413, at *6 (W.D. Va. Mar. 25, 2014); *Gallo*, 2006 WL1647194 at 2; *see also Dunkin' Donuts*, 2008 WL 110474, at *2 ("Courts have found waivers knowing and voluntary even in the context of franchise agreements, where contractual terms are often non-negotiable and where there may be a slight disparity of bargaining power between the parties.").

In *Taylor v. Republic Services*, Judge Lee upheld a jury waiver provision in an employment agreement. No:12-cv-00523-GBL-IDD, 2013 WL 8808090, at *3 (E.D. Va. Apr. 16, 2013). Rejecting plaintiff's claim that the contract was a product of unequal bargaining power, Judge Lee stated the contract "is not one-sided, as it applies to both employer and employee alike." *Id.* Furthermore, the court continued, "there is no evidence before the Court that Plaintiff did not possess sufficient education and experience to enter into the Agreement, nor has Plaintiff supplied any evidence to support a claim of unconscionability." *Id.* Here, the jury waiver provision applies to both parties. Beyond a cursory statement that Plaintiffs "had limited business/professional experience with

36

respect to contract negotiations and certainly had no knowledge
of the legal ramifications of the clauses," Plaintiffs have
offered no evidence to support this claim.  *See Bryant*, 762 F.2d
at 1196-97 (upholding a forum-selection clause where there was
no evidence to "suggest that [the plaintiff] is an
unsophisticated entity lacking sufficient commercial expertise
to be able to decide whether to enter into a given contract.").

Finally, Plaintiffs state that they were "not
permitted" to seek legal counsel prior to signing the contracts
"as they were told by GLS that not signing would result in
arrest."  (Pls.' Opp'n to Def.'s Mot. to Strike at 9-10.)
Defendant does dispute that Plaintiffs were not afforded the
opportunity to consult with legal counsel prior to signing the
agreement.  Other courts that considered this factor have
concluded that the lack of counsel was harmless error because
either the party challenging the waiver was sophisticated or the
waiver contained language that advised legal consultation.
*Dunkin' Donuts*, 2008 WL 110474, at *3 (stating that independent
legal review was unnecessary because one of the challengers was
an attorney and the other a sophisticated franchisee); *Gallo*,
2006 WL 1647194, at *2 (stating waiver had a conspicuous warning
admonishing plaintiff to consult with attorney prior to
signing).

37

This case presents different facts.  The jury trial waiver does not contain any language discussing independent legal review and Plaintiffs did not have an opportunity to have an attorney review the agreement.  Notwithstanding these facts, the lack of legal counsel does not merit striking the jury waiver provision.  Plaintiffs have not put forward any concrete evidence that they lacked sufficient expertise to understand the provision, and Defendant was under no duty to make sure that Plaintiffs fully informed themselves of the jury trial waiver. *Sydnor v. Conseco Fin. Serv. Corp.*, 252 F.3d 302, 306 (4th Cir. 2001).  Furthermore, upon signing the employment contracts Plaintiffs did not lose a jury trial right they had previously enjoyed.  The Engility contracts required any disputes to be resolved by binding arbitration.  (Def.'s Mot. to Dismiss Am. Compl. [Dkt. 80], Lucas Decl., Ex. 1 at 9.)  Therefore, Plaintiffs' lack of legal counsel in signing the agreements is not enough to defeat the jury trial waiver.

Considering all four factors, Plaintiffs knowingly and voluntarily agreed to the jury trial waiver.  Plaintiffs argue the jury trial waiver is unenforceable because of fraud, duress, or coercion.  This argument fails.  A party's contractual jury trial waiver is generally enforced unless a party alleges that its agreement to waive its jury trial right "was *itself* induced

by fraud." *Terry Phillips Sales, Inc. v. SunTrust Bank*, No. 3:13-CV-468, 2014 WL 670838, at * 7 (E.D. Va. Feb. 20, 2014) (emphasis added); *Silver v. JTH Tax, Inc.*, No. Civ.A. 2:05CV126, 2005 WL 1668060, at *7 (E.D. Va. June 21, 2005) ("[A]lthough the plaintiffs have made allegations of fraud in the inducement with respect to the Agreement itself, they have not singled out the jury trial waiver."). Plaintiffs have failed to allege any fraud related specifically to the inclusion of the jury trial waiver. Rather, their allegations of fraud and duress are directed at the contract as a whole. (*See* Pls.' Opp'n to Def.'s Mot. to Strike at 9–10.) Therefore, because the jury trial waiver itself was not the result of fraud, duress, or coercion, it is enforceable.

The jury trial waiver applies to all causes of action in this case. "Jury trial waivers in a contract are to be construed broadly to encompass both contract claims and related tort claims where the causes of action would not exist were it not for the relationship between [the parties], as well as counterclaims whether or not arising from the contract at issue." *Terry Phillips Sales*, 2014 WL 670838, at *7 (citation omitted) (internal quotation marks omitted). Here, the tort claims would not exist but for the contractual employer-employee relationship between Defendant and Plaintiffs. Therefore, the

39

waiver of jury trial applies to these claims because they are an outgrowth of the contractual relationship.

### IV.   Conclusion

For the foregoing reasons, the Court will grant Defendant's Motion to Dismiss as to Counts 2, 3, 5, 6, 7, 8 and will deny Defendant's Motion to Dismiss as to Counts 1 and 4. The Court will grant Defendant's Motion to Strike Plaintiffs' Jury Demand.  An appropriate Order will issue.


                                   /s/
_____
September 16, 2014              James C. Cacheris
Alexandria, Virginia     UNITED STATES DISTRICT COURT JUDGE